[No. B064697. Second Dist., Div. Four. Feb. 17, 1994.]

METRO TRAFFIC CONTROL, INC., Plaintiff and Appellant, v. SHADOW TRAFFIC NETWORK, Defendant and Respondent.

## Counsel

Andrews & Kurth, James B. Hicks, Kathy A. Jorrie and Brad Kuenning for Plaintiff and Appellant.

Latham & Watkins, William C. Bottger, Jr., Hugh Steven Wilson and Elizabeth A. Meinicke for Defendant and Respondent.

## Opinion

**VOGEL (C. S.), J.**—Metro Traffic Control, Inc., appeals (Code Civ. Proc., § 904.1, subd. (f)) from an order denying its request for a preliminary injunction to restrain respondent Shadow Traffic Network from soliciting Metro's employees to violate the noncompete and trade secret clauses of their employment contracts. We affirm and hold that the clauses are unenforceable absent evidence that Metro possesses a protectible trade secret.

### FACTUAL BACKGROUND

Metro is engaged in the traffic reporting business, contracting with radio stations to gather and broadcast local traffic information to stations' audiences. In 1990, Metro had a one-year written contract with radio station KFWB to provide traffic reporting services for the Los Angeles area. Unless renewed, the contract terminated on December 13, 1991. The contract includes an acknowledgment by KFWB that Metro's employees have agreed in writing to treat all traffic gathering and reporting procedures as confidential trade secrets of Metro and to not compete with Metro in the traffic reporting business during their employment and for one year following their termination.

In September, KFWB notified Metro it might not renew their contract and began soliciting new proposals for traffic reporting services. In October, representatives of Shadow met with KFWB and, on November 20, entered into a written agreement for Shadow to provide KFWB with traffic reporting services commencing December 13, 1991. Shadow immediately began staffing by transfers within its own organization and extending offers of employment to employees of Metro and other competitors. Shadow transferred three employees from its other locations to Los Angeles and hired twenty-one more, including Jeff Baugh, Robin Johnson, and Tommy Grskovich from Metro.

Baugh was an air traffic reporter for Metro from January 1989 to December 12, 1991, and worked almost exclusively for KFWB. In November 1991,

Bill Gaines, the regional director of operations for Metro, informed him and other employees that KFWB was not renewing its contract with Metro. Even though Gaines assured Baugh of continued employment, Baugh was concerned and entered into an agreement with Shadow to commence employment on December 13.

Robin Johnson was employed from June 1990 to December 12, 1991, as a traffic reporter. On November 22, Gaines informed her that Metro's contract with KFWB would not be renewed. Gaines told her that even though all of her work was performed for KFWB, it was not Metro's intent to fire her. Johnson contacted Shadow, which she understood would be taking over traffic reporting at KFWB, to initiate inquiries about employment. On November 26, she reached an agreement to commence employment with Shadow starting December 13. The next day, she gave Gaines notice she would terminate her employment at the end of the Metro/KFWB contract.

Tommy Grskovich was a managing producer for Metro. He was contacted by Shadow and offered higher wages and elected to terminate his employment and to go to work for Shadow. Shadow contacted and interviewed four other Metro employees regarding potential employment for the KFWB assignment.

Baugh, Johnson, and Grskovich and other Metro employees had written employment agreements. All of Metro's employment contracts were terminable at will at any time by either party and all included noncompete and trade secret clauses.[1]

---

[1]Metro used two forms of employment agreements and both include noncompete and trade secret clauses in substantially the same form. The operative contracts for 1990 provide in relevant part as follows:

"5. *Covenant Not To Compete.*

"5.1 Employee acknowledges that the Company has established a valuable and extensive trade in the services it provides, which has been developed at considerable expense to the Company. Employee agrees that, by virtue of the special training and knowledge that he has received or will receive from the Company, and the relationship of trust and confidence between Employee and the Company, Employee has or will have certain information and knowledge of the operations of the Company that are confidential and proprietary in nature, including, without limitation, information about Affiliates and Sponsors.

"5.2 In consideration of employment promotion[,] the training and knowledge that Employee has received and/or will receive from the company, the employment of Employee as provided in this agreement, and the disclosure by the Company to Employee of the knowledge and information described above, Employee covenants and agrees that he shall not engage in or make any preparations to engage in any Restricted Activity (as defined in Section 5.3 below) for any other business entity in competition with the Company for so long as he is employed by the Company and for a period of one (1) year thereafter. This prohibition shall

## APPELLANT'S CONTENTIONS

Metro contends the trial court (1) failed to rule on its request to enjoin Shadow from inducing Metro's employees to violate the noncompetition clauses of their employment agreements, and (2) erroneously concluded that there was insufficient evidence that Metro had any legally protected trade secrets.

## DISCUSSION

■ "The law is well settled that the decision to grant a preliminary injunction rests in the sound discretion of the trial court. [Citations.] . . . [¶] A trial court will be found to have abused its discretion only when it has ' "exceeded the bounds of reason or contravened the uncontradicted evidence." ' [Citations.] Further, the burden rests with the party challenging the [order] to make a clear showing of an abuse of discretion. [Citations.] [¶]

---

apply regardless of whether the termination of Employee's employment occurred with or without cause, at the instance of Employee of [sic] the Company.

"5.3 'Restricted Activities' shall consist of (1) the management and operation of traffic report gathering and broadcast, (2) soliciting Sponsors (as defined in Section 10.1 below) and dealing with accounts with respect thereto, (3) soliciting Affiliates (as defined in Section 10.2 below) to enter into any contract or arrangement with any person or organization to provide traffic report gathering or broadcast services, (4) broadcasting traffic reports on television or radio, and (5) forming or providing operational assistance to any business primarily engaged in the foregoing activities; provided that Restricted Activities shall exclude general newsgathering or general broadcast responsibilities which involve traffic reports only occasionally or incidentally, if rendered as a regular Employee of a television or radio station or network.

"5.4 The prohibition in this Section 5 shall apply only in the following metropolitan areas in which Employee is expected to have significant, on-going responsibility (such area to be defined according to the SMSA definitions published from time to time by the National Census Bureau/National Bureau of Labor Statistics): Los Angeles, Orange, San Bernardino & Riverside Counties.

"5.5 Notwithstanding the foregoing, the prohibition in this Section 5 shall not apply if Employee engaged in none of the Restricted Activities on behalf of the Company in the territory defined in Section 5.4 during the one (1) year period preceding the termination of his employment.

"6. *Covenant to Protect Trade Secrets and Confidential Information.* Employee recognizes that information concerning the Company, its Sponsor lists, its Affiliates, its technical systems, its contracts and its methods of operation are valuable assets of the Company and include trade secrets and confidential information which Employee agrees to safeguard for the exclusive benefit of the Company. Employee agrees that he shall not use or disclose any such trade secrets or confidential information, including information concerning the operations of the Company or its agreements or associations with Sponsors, Affiliates or any other third party, except as necessary to satisfy his employment responsibilities for the Company. The foregoing confidentiality agreement shall remain in effect, as to trade secrets, for two (2) years after the termination of his employment."

This court has traditionally held that trial courts should evaluate two inter-related factors when deciding whether or not to issue a preliminary injunction. The first is the likelihood that the plaintiff will prevail on the merits at trial. The second is the interim harm that the plaintiff is likely to sustain if the injunction were denied as compared to the harm that the defendant is likely to suffer if the preliminary injunction were issued. [Citations.] . . . [By] balancing the respective equities of the parties, [the court] concludes that, pending a trial on the merits, the defendant should or that he should not be restrained from exercising the right claimed . . . ." [Citations.] (*IT Corp.* v. *County of Imperial* (1983) 35 Cal.3d 63, 69-70 [196 Cal.Rptr. 715, 672 P.2d 121].) We review this record with these principles in mind.

## TRIAL COURT'S CONSIDERATION OF METRO'S CLAIMS

Metro argues that the trial court failed to consider and rule on its claim that Shadow was inducing Metro's employees to violate their covenants to not compete. The law and the record do not support that contention. The trial court's minute order reads: "Preliminary injunction is denied. The Court finds no legally protected trade secret and no showing of unfair competition." Although this cursory summary does not describe the court's reasoning or analysis, it does indicate it did consider all issues raised by the parties' memoranda, declarations, and oral arguments. Metro clearly characterized Shadow's solicitation of Metro's employees as an act of unfair competition and the court's minute order specifically addressed that reference. During the hearing, the court responded to Metro's comment that "we don't want Shadow calling our people," as follows: "[The court]: . . . I'm not aware of any authority that says that employees of one company cannot be contacted by telephone or otherwise and solicited as to employment by someone else." This reference is explicitly directed to Metro's claim that Shadow solicited Metro's employees to violate the noncompete covenants of their employment agreements. Any other construction of what occurred at the hearing simply ignores the record.

Even if the court's summary ruling does not disclose its reasoning, it is not legally deficient. ■ The denial of a preliminary injunction does not require any statement of decision or explanation. The hearing on a preliminary injunction is not the equivalent of a trial, and the court is not obligated to set forth its reasoning. (*City of Los Altos* v. *Barnes* (1992) 3 Cal.App.4th 1193, 1198 [5 Cal.Rptr.2d 77].) The trial court's minute order is entitled to a presumption that it is correct, and any error must be affirmatively shown. (*Denham* v. *Superior Court* (1970) 2 Cal.3d 557, 564 [86 Cal.Rptr. 65, 468 P.2d 193].) Metro has made no showing that the court did not address all of its claims.

Metro's reliance on *Cal-Dak Co.* v. *Sav-On Drugs, Inc.* (1953) 40 Cal.2d 492 [254 P.2d 497] is unavailing because that case involved the denial of an injunction solely on the ground that its issuance would violate federal antitrust law, foreclosing any consideration of whether the defendant threatened to continue the acts plaintiff wanted enjoined. Pending the appeal from the denial of the injunction, the federal antitrust law changed, so that an injunction could lawfully issue. The Supreme Court reversed and held that the case be remanded to the trial court to pass on the factual matters it could not previously consider. Here, the trial court was not foreclosed for any reason from hearing the motion for a preliminary injunction and, indeed, from the record before us it appears that the trial court considered and ruled on all of Metro's claims. All we are required to do in resolving this appeal is to determine if the trial court abused its discretion in denying the injunction.

## MERITS OF METRO'S CLAIMS

### *Unenforceable Restrictive Covenants*

■ The restrictive covenants of Metro's employment contracts prohibit an employee from (1) managing and operating any broadcasting of traffic information, (2) broadcasting traffic reports on television or radio, and (3) providing any operational assistance to any business engaged in developing and broadcasting traffic reports for any competitor of Metro during the term of employment and for one year following termination. The contract further provides that an employee shall not use or disclose "trade secrets and confidential information" except as required for his employment at [and for] Metro and "for two (2) years after the termination of his employment."

Business and Professions Code section 16600 provides: ". . . every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." California courts have consistently declared this provision an expression of public policy to ensure that every citizen shall retain the right to pursue any lawful employment and enterprise of their choice. Section 16600 has specifically been held to invalidate employment contracts which prohibit an employee from working for a competitor when the employment has terminated, unless necessary to protect the employer's trade secrets. (*Muggill* v. *Reuben H. Donnelley Corp.* (1965) 62 Cal.2d 239, 242 [42 Cal.Rptr. 107, 398 P.2d 147, 18 A.L.R.3d 1241].) The corollary to this proposition is that competitors may solicit another's employees if they do not use unlawful means or engage in acts of unfair competition. In *Diodes, Inc.* v. *Franzen* (1968) 260 Cal.App.2d 244, 255 [67 Cal.Rptr. 19], the court held that ". . . no actionable wrong is

committed by a competitor who solicits his competitor's employees or who hires away one or more of his competitor's employees who are not under contract, so long as the inducement to leave is not accompanied by unlawful action."[2] The court elaborated on the necessity for this policy with the observation that "[t]he interests of the employee in his own mobility and betterment are deemed paramount to the competitive business interests of the employers, where neither the employee nor his new employer has committed any illegal act accompanying the employment change." (*Id.* at p. 255.) Here, Metro complains that "every employee induced to leave Metro by Shadow has violated his or her restrictive covenant not to provide traffic reporting services to KFWB for a period of one year after the termination of their respective employment relation with Metro." This restriction standing by itself is unenforceable because it severely restricts Metro's employees' mobility and betterment.

## No Unfair Competition

The record does not reveal that Shadow had anything to do with KFWB's decision to not renew its relationship with Metro. In fact, the evidence shows that KFWB awarded Shadow the 1991 contract without any requirement or assurance regarding the personnel that would be engaged to service its account. Shadow did not begin to contact or interview Metro's employees until after it had a commitment from KFWB. Shadow does not occupy a fiduciary relationship with Metro and, in any event, there is no showing that Shadow laid plans or took steps to hire away Metro's key employees for the purpose of stealing KFWB as a customer. This matter bears no comparison to *Bancroft-Whitney Co.* v. *Glen* (1966) 64 Cal.2d 327, 353 [49 Cal.Rptr. 825, 411 P.2d 921, 24 A.L.R.3d 795], cited by Metro, where the defendant breached a fiduciary duty while still employed as the executive director of the plaintiff. As a competitor of Metro, absent a showing of unlawful purpose or means, Shadow is privileged and not liable for inducing Metro's employees to leave and move to Shadow. (Annot. (1969) 24 A.L.R.3d 821.)

## No Trade Secrets

The merit of Metro's claim depends on its ability to demonstrate that it has a protectible trade secret. Business and Professions Code section 16600 prohibits the enforcement of Metro's noncompete clause except as is necessary to protect trade secrets. (*Muggill* v. *Reuben H. Donnelley Corp.*, *supra*,

---

[2] We read the qualification of *Diodes* regarding "employees who are not under contract" to mean an employment contract other than employment at will. Here, Metro's employees were, by the terms of their contract, at-will employees. Either Metro or the employee could sever their relationship at any time.

62 Cal.2d 239, 242.) One commentator closes this analytical circle neatly: "Any attempt to restrict competition by the former employee by contract appears likely to be doomed under section 16600 of the Business and Professions Code, unless the restriction is carefully limited and the agreement protects merely a proprietary or property right of the employer recognized as entitled to protection under the general principles of unfair competition. In other words, it seems that the employer will be able to restrain by contract only that conduct of the former employee that would have been subject to judicial restraint under the law of unfair competition, absent the contract." (Hays, *Unfair Competition—Another Decade* (1963) 51 Cal.L.Rev. 51, 69, fn. omitted.) Metro argues that it has protectible trade secrets developed in the course of serving as KFWB's traffic reporter. It describes the trade secrets as information it has about the peculiar requirements imposed by KFWB on Metro's traffic reporting services during the term of their contract relationship.

Metro delineates its alleged trade secrets in very general terms. William Gaines, the regional director of Metro, describes the trade secrets as KFWB's "very strict and particular requirements regarding the quality, sound and personality of the anchors reporting over its airways [and] KFWB hand-picks each of its anchors." Rudy Grande is a Metro airborne traffic reporter who refused an offer of employment from Shadow. He describes Metro's trade secrets in these terms: "KFWB has always had very strict requirements about the quality, sound and personality of the anchors reporting over its airwaves. Essentially, KFWB hand-picked each of its anchors. I was one of the very few Metro traffic reporters who was accepted by and approved by KFWB to appear on its airwaves." Jennifer York is another of Metro's airborne reporters. She interviewed with but did not receive an offer from Shadow. She characterizes the trade secrets as the "significant knowledge regarding the special needs and requirements of KFWB . . . . KFWB has a particular style, sound and personality which it requires its anchors to use, a particular preference regarding the 'proper' format for reporting traffic, and particular requirements regarding the choice of words used by the anchors reporting traffic over its airwaves." Bill Yeager, currently the mid-Atlantic regional director of Metro and formerly a news director and executive editor for KFWB, declares that KFWB "had (1) a unique format for traffic reporting . . . ; (2) peculiar idiosyncrasies regarding appropriate word choice . . . ; and (3) particular expectations about the personality of the traffic reporter . . . [and the] expectation that the traffic reporter report both news and traffic in a factually descriptive fashion." This is the sum total of the evidence offered to support Metro's contention that it possesses protectible trade secrets.

Metro takes the position it is entitled to equitable protection afforded to an employer confronting competition from former employees who have knowledge of the employer's customers' " 'peculiar likes and fancies and other characteristics.' " (See *Aetna Bldg. Maintenance Co.* v. *West* (1952) 39 Cal.2d 198, 205 [246 P.2d 11].) The standard that Metro endeavors to establish is generally applicable in the "route" cases where the identity of the customer is not generally known and the employee has become familiar with special information regarding customer lists, quantities, price lists, discounts, etc. (*Ibid.*; *Courtesy Temporary Service, Inc.* v. *Camacho* (1990) 222 Cal.App.3d 1278, 1286-1288 [272 Cal.Rptr. 352].) The analogy to "route" cases fails for several reasons.

It appears that Metro's battery of radio announcers had the "quality, sound and personality" required by KFWB. These are subjective dimensions of the employees who were found acceptable to and approved by KFWB and not part of an informational base belonging to Metro. No doubt Metro conveyed to its employees KFWB's preferences and requirements regarding word choice and factual reporting but that does not amount to the compilation of an intangible personal property right owned by the employer. Actors, musicians, athletes, and others are frequently trained, tutored, and coached to satisfy the requirements of their sponsors and audiences, but their talents belong to them to contract away as they please. (See *KGB, Inc.* v. *Giannoulas* (1980) 104 Cal.App.3d 844, 851, 853 [164 Cal.Rptr. 571].) If Metro wanted to assure the continued availability of these employees (and their voice qualities and personalities) for future assignments or simply to shrink the pool of available talent, it could enter into exclusive long-term contracts to that end.[3] Simply hiring personnel who possess the requirements specified by a customer does not convert the employee into a "trade secret." In other words, a stable of trained and talented at-will employees does not constitute an employer's trade secret.

Metro's focus, as general as it is, emphasizes the personal qualities of the announcers, not the information related to them. Metro's mid-Atlantic regional director, attempting to cast KFWB's requirements as Metro's trade secrets, recounts his work in coaching Baugh and Johnson to develop their "quality, sound, and personalities." He candidly reveals what is at the heart of Metro's claim: Baugh and Johnson have been promoted by KFWB and they have become known radio personalities in the Los Angeles area and their training was at Metro's expense. The vague and generalized description of Metro's "trade secrets" is nothing more than a "job classification" for

---

[3]An exclusive contract for personal services is enforceable by injunctive relief if it meets the requirements of Civil Code section 3423, subdivision (e).

radio traffic announcers. It fails to describe any body of information independent of the ability of its employees to satisfy KFWB's requirements. Metro's references to "unique format" and "peculiar idiosyncrasies regarding word choices" and similar terms are undefined conclusions revealing nothing susceptible to appropriation or misappropriation.[4]

Shadow's solicitation of Metro's personnel followed its acquisition of the KFWB assignment. KFWB did not require Shadow to use Metro's employees as a condition of entering into its contract with Shadow. The declaration of the vice-president and general manager of KFWB informed the trial court that "[w]hile . . . KFWB does have certain expectations regarding the quality and style of its traffic reporting services, these requirements are neither secret nor particularly complex. . . . Upon contracting with Shadow, we fully and openly described our requirements and expectations for their service . . . and provided Shadow with essentially the same information, coaching and support . . . provided [to] Metro." He concludes with the opinion that there are no trade secrets but, if there are, they belong to KFWB. We agree. Because KFWB was providing Shadow with all the information it had provided to Metro, it is impossible to discern what information Metro's employees could disclose that was not directly available to Shadow from KFWB.

Finally, Civil Code section 3426.1, subdivision (d)(1) provides trade secrets include "a formula, pattern, compilation, program, device, method, technique, or process, that: (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use . . . ." Here, the information imparted to Metro by KFWB is equally available to anyone contracting with KFWB. If KFWB imparts its requirements to Shadow independent of any contact with Metro's former employees, Shadow is "another" person who can obtain economic value from its use. Consequently, there is no statutory trade secret. There is no evidence that Baugh, Johnson, and Grskovich provided Shadow with any information of any kind. Since KFWB is the original source, it was hardly necessary for them to do so.

In summary, Metro has not demonstrated that it possesses any trade secret, and the trial court could rationally conclude that it is unlikely Metro will

---

[4]Some of the declarations submitted by Metro include the statement that the declarant could be more specific but refrained from doing so to protect the confidentiality of Metro's trade secrets. This explanation does nothing to enhance the merits of Metro's claims and reveals a reluctance to invoke the provision of Civil Code section 3426.5 which provides the appropriate procedure for preservation of secrecy in a judicial proceeding.

prevail on the merits. We hold the trial court did not abuse its discretion in denying the preliminary injunction.[5]

### DISPOSITION

The order denying a preliminary injunction is affirmed.

Epstein, Acting P. J., and Klein (Brett), J.,* concurred.

A petition for a rehearing was denied March 11, 1994.

---

[5]We deny, however, Shadow's request for frivolous appeal sanctions. (*In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 650 [183 Cal.Rptr. 508, 646 P.2d 179].)

*Judge of the Municipal Court for the Los Angeles Judicial District sitting under assignment by the Chairperson of the Judicial Council.