[No. S114811. Aug. 12, 2004.]

ROBERT L. REEVES et al., Plaintiffs and Respondents, v.
DANIEL P. HANLON et al., Defendants and Appellants.

## COUNSEL

Dwyer, Daly, Brotzen & Bruno, Toni Rae Bruno, Marlin D. Wall and Ilan A. Charnelle for Defendants and Appellants.

Deborah J. La Fetra and Timothy Sandefur for Pacific Legal Foundation as Amicus Curiae on behalf of Defendants and Appellants.

Ballard, Rosenberg, Golper & Savitt, John J. Manier, Linda C. Miller Savitt; Arter & Hadden, David Gurnick, Sue Bendavid-Arbiv; Robert L. Reeves & Associates, Robert L. Reeves, Robert J. DuPont and Richard M. Wilner for Plaintiffs and Respondents.

## OPINION

**BAXTER, J.**—The primary issue presented is whether a defendant may be held liable under an intentional interference theory for having induced an at-will employee to quit working for the plaintiff. Because an interference as such is primarily an interference with the future relation between the plaintiff and the at-will employee, we hold that inducing the termination of an at-will employment relation may be actionable under the standard applicable to claims for intentional interference with prospective economic advantage.

Accordingly, to recover for a defendant's interference with an at-will employment relation, a plaintiff must plead and prove that the defendant engaged in an independently wrongful act—i.e., an act "proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard" (*Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1159 [131 Cal.Rptr.2d 29, 63 P.3d 937] (*Korea Supply*))—that induced the at-will employee to leave the plaintiff.

Adopting this standard of recovery in the context of at-will employment relations is particularly appropriate. Not only will it guard against unlawful methods of competition in the job market, but it will promote the public policies supporting the right of at-will employees to pursue opportunities for economic betterment and the right of employers to compete for talented workers. In this regard, it is clear from the standard that one commits no actionable wrong by merely soliciting or hiring the at-will employee of another.

Another issue presented in this case concerns the propriety of the trial court's award for violations of the Uniform Trade Secrets Act (UTSA) (Civ. Code, § 3426 et seq.). We find the award was proper, and affirm the judgment of the Court of Appeal in its entirety.

FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs Robert L. Reeves and Robert L. Reeves & Associates, A Professional Law Corporation, brought the instant lawsuit against defendants Daniel P. Hanlon, Colin T. Greene, and Hanlon & Greene, A Professional Corporation (H&G). The operative complaint included the following allegations: In 1995, Reeves's law firm, which emphasized immigration law and litigation, employed Hanlon as an attorney. In 1997, the firm employed Greene as an associate attorney. In 1998, Reeves entered into an agreement with Hanlon whereby Hanlon could earn an equity position in a law firm to be formed; thereafter, the firm's name was changed to "Reeves and Hanlon, Professional Law Corporation." On or about June 30, 1999, both Hanlon and Greene resigned from Reeves's firm without notice or warning. They improperly persuaded plaintiffs' employees to join H&G, personally solicited plaintiffs' clients to discharge plaintiffs and to instead obtain services from H&G, misappropriated plaintiffs' trade secrets, destroyed computer files and data, and withheld plaintiffs' property, including a corporate car. The complaint asserted 14 causes of action, including intentional interference with contractual relationships, interference with prospective business opportunity, conspiracy to interfere with prospective economic advantage, misappropria-

tion of confidential information in violation of the UTSA, unauthorized use of a corporate car, and destruction of corporate property.[1]

Pursuant to a stipulated order, plaintiffs agreed to proceed to trial only on the foregoing causes of action. As pertinent here, the stipulated order specified that plaintiffs' claims would be resolved by a bench trial and that any recovery following trial would be limited to $150,000.

Trial of the matter commenced in January 2001. Following the presentation of briefing, evidence, and arguments, the trial court issued a statement of decision concluding that Hanlon and Greene had assumed fiduciary duties to plaintiffs and that they had engaged in interference with contracts and prospective business opportunity, and misappropriation of trade secrets. The court determined that, for more than five months prior to their departure, Hanlon and Greene had accessed plaintiffs' password-protected computer database to print out confidential name, address, and phone number information on 2,200 clients and had fomented dissatisfaction among plaintiffs' personnel. Although Greene had been chair of plaintiffs' litigation department and Hanlon had been responsible for over 500 client matters when they abruptly resigned without notice, they left no status reports or lists of matters or deadlines on which they had been working. Nor did they attempt to cooperate with plaintiffs on a notice to clients. Shortly before resigning, Greene intentionally erased extensive computer files in plaintiffs' computer server containing client documents and form files used by plaintiffs. The evening of their resignations, defendants personally solicited plaintiffs' key employees. As a result, plaintiffs lost nine employees over the next 60 days, six of them joining defendants' new firm. Defendants also began a campaign to solicit plaintiffs' clients, contacting at least 40 clients by telephone without offering them a choice of counsel. All of this had been "intentionally done . . . to disrupt [plaintiffs'] ongoing business." Although historically, plaintiffs typically lost only one or two clients a month, plaintiffs lost 144 clients to defendants over the next 12 months.

The trial court found that defendants' conduct caused damage to plaintiffs in the total amount of $182,180.18, as follows: (1) 144 of plaintiffs' clients who transferred to H&G did not pay $62,540.50 in fees that they owed to plaintiffs; (2) plaintiffs suffered $36,000 in lost future business revenue; (3) plaintiffs incurred $61,639.68 in expenses to mitigate damages, including

---

[1] Hanlon and H&G filed a separate action against plaintiffs, and the two actions were consolidated. Greene then filed a separate cross-complaint against plaintiffs in the consolidated action. Hanlon and H&G alleged that plaintiffs had improperly withheld files and other materials belonging to H&G's clients after Hanlon resigned, and that plaintiffs had converted Hanlon's car. Greene, in turn, alleged that plaintiffs had failed to pay him commissions in accordance with his employment contract. These claims and cross-claims were either settled or arbitrated and are not at issue here.

$41,630.49 for informing clients that the firm was still in business and $20,009.19 for recruiting replacement employees; and (4) defendants were unjustly enriched in the amount of $22,000 due to the misappropriation of confidential client information. The court, however, declined to award punitive damages, finding that defendants did not act with malice, oppression or fraud, but instead acted out of "immaturity" and "an apparent get-rich-quick mentality at the expense of [plaintiffs]." The court reduced the damages award to $150,000 pursuant to the parties' stipulation, and thereafter awarded plaintiffs $47,427.63 in costs after granting in part and denying in part a motion to tax costs. Judgment was entered accordingly.

The Court of Appeal reversed the trial court's order denying in part the motion to tax costs and remanded for entry of a new order regarding costs. It affirmed the judgment in all other respects. As relevant here, the appellate court concluded that plaintiffs' interference claims were legally sound and substantially supported by the record, and also that their misappropriation of trade secrets claim was substantially supported.

DISCUSSION

### A. *Intentional Interference with At-will Employment Relations*

Preliminarily, we state what is not at issue here. We have not been asked to review the propriety of the determinations by the trial court and the Court of Appeal that defendants are liable to plaintiffs for their tortious interference with plaintiffs' *client* relations and prospective *client* opportunities. Accordingly, we accept in full the Court of Appeal's conclusion that "[t]here is direct evidence that [Hanlon's and Greene's] departure was calculated to cripple the Reeves firm's ability to provide legal services: they left abruptly, damaged computer files, removed firm property, and failed to provide adequate guidance concerning their open cases. [¶] There is also evidence indicating that Hanlon and Greene phoned far more clients than the 40 or so clients they admitted to contacting, and [that] they exploited these clients' lack of facility with English and ignored their rights concerning the selection of counsel [citation]."

While the issue here does concern defendants' interference with plaintiffs' *employee* relations, we emphasize the following matters also are not in dispute. First, it is not disputed that the nine employees who left Reeves's firm, including the six who joined H&G, had employment relationships with plaintiffs that they could terminate at will. Second, we accept as undisputed the Court of Appeal's conclusion that the record contains substantial evidence that defendants "mounted a campaign against the Reeves firm involving destruction of computer records, misuse of confidential information, and

unethical conduct, of which the cultivation of employee discontent was only a component. This campaign unfairly impaired the Reeves firm's ability to retain its employees." Third, we accept the Court of Appeal's additional determination that the record contains substantial evidence that plaintiffs incurred expenses, above the historical baseline, of $20,009.19 for employee recruitment to mitigate damages.[2]

What is disputed is the Court of Appeal's legal conclusion that "an employer may recover for interference with the employment contracts of its at-will employees by a third party when the third party does not show that its conduct in hiring the employees was justifiable or legitimate." Relying primarily on *GAB Business Services, Inc. v. Lindsey & Newsom Claim Services, Inc.* (2000) 83 Cal.App.4th 409 [99 Cal.Rptr.2d 665] (*GAB*), defendants argue California law does not and should not recognize a cause of action in favor of an employer against another employer for interference with contractual relations by virtue of an offer of employment to an at-will employee.

■ We start by observing that, in California, the law is settled that "a stranger to a contract may be liable in tort for intentionally interfering with the performance of the contract." (*Pacific Gas & Electric Co. v. Bear Stearns & Co.* (1990) 50 Cal.3d 1118, 1126 [270 Cal.Rptr. 1, 791 P.2d 587], and cases cited.) To prevail on a cause of action for intentional interference with contractual relations, a plaintiff must plead and prove (1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage. (*Ibid.*) To establish the claim, the plaintiff need not prove that a defendant acted with the primary purpose of disrupting the contract, but must show the defendant's knowledge that the interference was certain or substantially certain to occur as a result of his or her action. (*Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 56 [77 Cal.Rptr.2d 709, 960 P.2d 513].)

■ May the tort of interference with contractual relations be predicated upon interference with an at-will contract? Historically, the answer is yes. A third party's "interference with an at-will contract is actionable interference with the contractual relationship" because the contractual relationship is at the will of the parties, not at the will of outsiders. (*Pacific Gas & Electric Co. v. Bear Stearns & Co., supra,* 50 Cal.3d at p. 1127; *Speegle v. Board of Fire Underwriters* (1946) 29 Cal.2d 34, 39 [172 P.2d 867].)

---

[2] Defendants did not petition the Court of Appeal for a rehearing regarding these factual matters, nor did they petition this court for their review. We therefore shall disregard any attempts defendants make in their briefing to expand the scope of review to include such matters.

■ More specifically, may such tort be based on interference with an at-will employment relationship? Again, historically, the answer is yes. (E.g., *Savage v. Pacific Gas & Electric Co.* (1993) 21 Cal.App.4th 434, 448 [26 Cal.Rptr.2d 305] [tort of interference with contractual relations may be based on an at-will employment contract]; *Kozlowsky v. Westminster Nat. Bank* (1970) 6 Cal.App.3d 593, 598 [86 Cal.Rptr. 52] ["the fact that the Bank was privileged to discharge plaintiff at any time does not necessarily privilege a third party unjustifiably to induce the termination"].)

■ As reflected in our decisional and statutory law, however, it has long been the public policy of our state that "[a] former employee has the right to engage in a competitive business for himself and to enter into competition with his former employer, even for the business of . . . his former employer, provided such competition is fairly and legally conducted." (*Continental Car-Na-Var Corp. v. Moseley* (1944) 24 Cal.2d 104, 110 [148 P.2d 9]; Bus. & Prof. Code, § 16600 [generally recognizing as void any agreement "by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind"].) Consistent with this policy favoring competition, decisions involving parties in competition readily indicate that certain competitive conduct is nonactionable when it interferes with the at-will contract relations of another. *Buxbom v. Smith* (1944) 23 Cal.2d 535 [145 P.2d 305] (*Buxbom*), for example, explained that "where the means of interference involve no more than recognized trade practices such as advertising or price-cutting, the plaintiff's loss as a result of the competitive strife is deemed *damnum absque injuria*." (*Id.* at p. 546; see *San Francisco Design Center Associates v. Portman Companies* (1995) 41 Cal.App.4th 29, 41 [50 Cal.Rptr.2d 716] [the privilege of competition is inapplicable to interference with an existing contract unless the contract is terminable at will].)

■ More to the point here, *Buxbom* observed that "it is not ordinarily a tort to hire the employees of another for use in the hirer's business." (*Buxbom, supra*, 23 Cal.2d at p. 547.) As *Buxbom* explained, however, this general rule is subject to one significant limitation: "This immunity against liability is not retained . . . if unfair methods are used in interfering in such advantageous relations." (*Ibid.*) In *Buxbom*, the record established that the defendant gained an unfair advantage over the plaintiff through "deceptive dealings" (*ibid.*) and "false promises" made in connection with a distribution contract between the parties that the defendant had no intention of performing

(*id*. at p. 548).[3] He "deliberately induced the plaintiff to build up his distributing organization" to perform the contract and in a matter of weeks became the plaintiff's sole customer. (*Id*. at p. 547.) Once the defendant acquired this strategic position, he breached the distribution contract "to cut off the work required to sustain plaintiff's organization" and "to prevent plaintiff from competing effectively for the retention of [his] employees." (*Id*. at p. 548.)

*Buxbom* first indicated that the defendant's breach of the distribution contract was "a wrong and in itself actionable," but then proceeded to find the breach also constituted "an unfair method of interference with advantageous relations." (*Buxbom, supra*, 23 Cal.2d at p. 548.) Its reasoning was this: "Although defendant's conduct may not have been tortious if he had merely broken the contract and subsequently decided to hire plaintiff's employees," he was "guilty of a tortious interference in the relationship between the plaintiff and his employees" because he "intentionally utilized" the breach of the distribution contract "as the means of depriving plaintiff of his employees." (*Ibid*.)

Subsequent to *Buxbom*, the court in *Diodes, Inc. v. Franzen* (1968) 260 Cal.App.2d 244 [67 Cal.Rptr. 19] (*Diodes*) reiterated the so-called privilege of competition, as applied in the context of employment relations, as follows: "Even though the relationship between an employer and his employee is an advantageous one, no actionable wrong is committed by a competitor who solicits his competitor's employees or who hires away one or more of his competitor's employees who are not under contract, so long as the inducement to leave is not accompanied by unlawful action." (*Id*. at p. 255.) "However, if either the defecting employee or the competitor uses unfair or deceptive means to effectuate new employment, or either of them is guilty of some concomitant, unconscionable conduct, the injured former employer has a cause of action to recover for the detriment he has thereby suffered." (*Ibid*.; see also *Metro Traffic Control, Inc. v. Shadow Traffic Network* (1994) 22 Cal.App.4th 853, 860 [27 Cal.Rptr.2d 573] (*Metro*) ["[a]s a competitor of Metro, absent a showing of unlawful purpose or means, Shadow is privileged and not liable for inducing Metro's employees to leave and move to Shadow"].)

Strictly speaking, the foregoing authorities did not address the matter of competition in suits involving causes of action for intentional interference

---

[3] There were two defendants in *Buxbom*, defendant Smith and defendant Wright. *Buxbom* sustained the judgment against Smith, who was a party to the distribution contract at issue, but reversed the judgment against Wright, finding that Wright acted merely as Smith's agent. (See *Buxbom, supra*, 23 Cal.2d at p. 540.) Although the *Buxbom* opinion refers sometimes to both defendants, and at other times only to Smith, in describing the same wrongful conduct, our opinion simply will refer to "defendant" in the singular for the sake of consistency.

with at-will employment relations; rather, those cases involved breach of fiduciary duty claims (*Diodes*), claims for injunctive relief based on contractual noncompete clauses and trade secrets allegations (*Metro*), or claims for damages sustained in conjunction with a breach of contract (*Buxbom*).[4]

■ Nonetheless, the same considerations support similar limitations for actions alleging interference with an at-will employment relation. Where no unlawful methods are used, public policy generally supports a competitor's right to offer more pay or better terms to another's employee, so long as the employee is free to leave. As Judge Learned Hand observed long ago, if the law were to the contrary, the result "would be intolerable, both to such employers as could use the employe[e] more effectively and to such employe[e]s as might receive added pay. It would put an end to any kind of competition." (*Triangle Film Corp. v. Artcraft Pictures Corp.* (2d Cir. 1918) 250 F. 981, 982.) Or as *Diodes* put it: "The interests of the employee in his own mobility and betterment are deemed paramount to the competitive business interests of the employers, where neither the employee nor his new employer has committed any illegal act accompanying the employment change." (*Diodes, supra,* 260 Cal.App.2d at p. 255.)

Moreover, the economic relationship between parties to contracts that are terminable at will is distinguishable from the relationship between parties to other legally binding contracts. We have explained the policy generally protecting contracts this way: "The courts provide a damage remedy against third party conduct intended to disrupt an existing contract precisely because the exchange of promises resulting in such a formally cemented economic relationship is deemed worthy of protection from interference by a stranger to the agreement. Economic relationships short of contractual, however, should stand on a different legal footing as far as the potential for tort liability is reckoned." (*Della Penna v. Toyota Motor Sales, U.S.A., Inc.* (1995) 11 Cal.4th 376, 392 [45 Cal.Rptr.2d 436, 902 P.2d 740].)

■ But as the Restatement Second of Torts explains, if a party to a contract with the plaintiff is free to terminate the contractual relation when he chooses, "there is still a subsisting contract relation; but any interference with it that induces its termination is primarily an interference with the future relation between the parties, and the plaintiff has no legal assurance of them. As for the future hopes he has no legal right but only an expectancy; and when the

---

[4] Although the plaintiff in *Buxbom* was awarded damages of $4,000 for the loss of his trained organization, supervisors, goodwill, and general damages to his business, the decision observed that such items could not be a proper element of damages for the defendants' breach of the distribution contract at issue. (*Buxbom, supra,* 23 Cal.2d at pp. 540–541.) Nonetheless, *Buxbom* affirmed the damages award because the plaintiff's complaint sufficiently alleged "loss occasioned by the [defendants'] tortious acts" and the relief awarded was "commensurate with the injuries shown to have been sustained." (*Id.* at p. 543.)

contract is terminated by the choice of [a contracting party] there is no breach of it. The competitor is therefore free, for his own competitive advantage, to obtain the future benefits for himself by causing the termination. Thus, he may offer better contract terms, as by offering an employee of the plaintiff more money to work for him or by offering a seller higher prices for goods, and he may make use of persuasion or other suitable means, all without liability." (Rest.2d Torts, § 768, com. i.)[5] Under this analysis, an interference with an at-will contract properly is viewed as an interference with a prospective economic advantage, a tort that similarly compensates for the loss of an advantageous economic relationship but does not require the existence of a legally binding contract.

We observe that in California, both of these torts protect the public interest in stable economic relationships and both share the same intent requirement. (*Korea Supply, supra,* 29 Cal.4th at p. 1157 [defendant must know that interference was certain or substantially certain to occur as a result of its action].) But while many of the elements of the two torts are similar,[6] a plaintiff seeking to recover for interference with prospective economic advantage must also plead and prove that the defendant engaged in an independently wrongful act in disrupting the relationship. (*Korea Supply, supra,* 29 Cal.4th at p. 1158.) In this regard, "an act is independently wrongful if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard." (*Ibid.,* fn. omitted.)

Consistent with the decisions recognizing that an intentional interference with an at-will contract may be actionable, but mindful that an interference as such is primarily an interference with the future relation between the contracting parties, we hold that a plaintiff may recover damages for intentional interference with an at-will employment relation under the same California standard applicable to claims for intentional interference with prospective economic advantage. That is, to recover for a defendant's interference with an at-will employment relation, a plaintiff must plead and prove that the defendant engaged in an independently wrongful act—i.e., an act

---

[5] We have in the past acknowledged the Restatement's view and observed that certain judicial and other authorities also have treated claims of interference with contracts terminable at will (and with voidable contracts) as coming within the cause of action for interference with prospective advantage. (*Pacific Gas & Electric Co. v. Bear Stearns & Co., supra,* 50 Cal.3d at p. 1128, fn. 4.) Although we suggested it may be preferable not to distinguish the two as separate torts, we left the matter open. (*Ibid.*)

[6] To prevail on a cause of action for intentional interference with prospective economic advantage in California, a plaintiff must plead and prove (1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) the defendant's intentional acts designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the defendant's acts. (*Youst v. Longo* (1987) 43 Cal.3d 64, 71, fn. 6 [233 Cal.Rptr. 294, 729 P.2d 728].)

"proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard" (*Korea Supply, supra,* 29 Cal.4th at p. 1159)—that induced an at-will employee to leave the plaintiff.[7] Under this standard, a defendant is not subject to liability for intentional interference if the interference consists merely of extending a job offer that induces an employee to terminate his or her at-will employment.

We now turn to defendants' contention, supported by *GAB, supra,* 83 Cal.App.4th 409, that an employer should not, as a matter of law, be permitted to maintain a cause of action against another employer for intentional interference with an at-will employment contract. In *GAB,* the plaintiff's regional vice-president obtained an employment offer from a competitor. (83 Cal.App.4th at pp. 413–414.) Before leaving the plaintiff, he successfully recruited several of the plaintiff's employees to join the competitor with him. (*Id.* at pp. 414–415.) At trial, a jury rendered verdicts in favor of the competitor and the plaintiff's former regional vice-president on the plaintiff's claims for breach of fiduciary duty, unfair competition, misappropriation of trade secrets, and interference with contract.

Finding that the trial court erred prejudicially in refusing to instruct the jury that the regional vice-president was a fiduciary of the plaintiff as a matter of law, *GAB* reversed the judgment with respect to both the breach of fiduciary duty and unfair competition causes of action. But *GAB* further held that the plaintiff could not, as a matter of law, maintain a cause of action for interference with its at-will employment contracts, even though breaches of fiduciary duty and unfair competition may have occurred. Although previous decisions had recognized tortious interference claims brought by *employees* to redress interference with their at-will employment relationships, *GAB* found significant the apparent lack of case law expressly authorizing *employers* to assert such claims. (*GAB, supra,* 83 Cal.App.4th at p. 427; but see *Buxbom, supra,* 23 Cal.2d 535.) *GAB* concluded that to "expand" the tort to include employer claims would "invite innumerable lawsuits," undermine California's strong public policy supporting the mobility and betterment of employees, and chill employment opportunities. (*GAB, supra,* at pp. 427–428.) Although *GAB* professed its reluctance "to condone unfair or unlawful conduct among employers competing for talented employees," it believed the "tort of unfair competition" could adequately address that problem.[8] (*GAB, supra,* at p. 428.)

---

[7] Because the wrongful conduct in this case pertains only to the termination of at-will contracts, we need not and do not express an opinion whether an independent wrongfulness requirement would be appropriate for cases in which a defendant allegedly induces the breach of an otherwise enforceable term of an at-will contract.

[8] It may be inferred from the facts of *GAB* and the authority to which *GAB* cites (*Bancroft-Whitney Co. v. Glen* (1966) 64 Cal.2d 327 [49 Cal.Rptr. 825, 411 P.2d 921]) that the "tort of unfair competition," so indicated, refers to a theory of liability premised upon an

We are not convinced. First, it is firmly established in California that intentionally interfering with an at-will contractual relation is actionable in tort, and we perceive no legal, logical, or policy basis for restricting the availability of this tort to employees. Significantly, neither *GAB* nor defendants here point to any empirical or evidentiary support for the conclusion that employer claims requiring a showing of unlawful conduct would prompt innumerable lawsuits and chill employment opportunities.

If anything, *GAB*'s assertion that another tort presently addresses the problem of unlawful conduct among employers supports, rather than undermines, the idea that employers should be able to invoke the interference tort. The fact that such interference may already be actionable reinforces the point that employers deserve protection from other employers who engage in such wrongful conduct. Moreover, there is no indication that current litigation over such matters is rampant or has had the chilling effect *GAB* describes. Hence, such concerns appear unfounded and speculative at best.

Second, as discussed, case law in analogous contexts shields those employers who hire a competitor's at-will employees without engaging in unlawful conduct. (E.g., *Metro, supra,* 22 Cal.App.4th 853; *Diodes, supra,* 260 Cal.App.2d 244; see *Buxbom, supra,* 23 Cal.2d 535.) By recognizing similar restrictions in interference actions, we respect both the right of at-will employees to pursue opportunities for economic betterment and the right of employers to compete for talented workers, and in doing so strike the proper balance between society's interest in fostering robust competition in the job market and its interest in protecting against unlawful methods of competition.

Accordingly, we reject *GAB*'s categorical holding that an employer may never maintain a cause of action against a competitor for intentional interference with its at-will employment relations. We disapprove *GAB Business Services, Inc. v. Lindsey & Newsom Claim Services, Inc., supra,* 83 Cal.App.4th 409, to the extent it conflicts with the views expressed herein.

We now address whether application of the principles we announce today calls for affirmance of the $20,009.19 award against defendants. We conclude it does. Here, it is undisputed that Hanlon and Greene engaged in unlawful and unethical conduct in mounting a campaign to deliberately disrupt plaintiffs' business. (See *ante,* pp. 1147–1148 & fn. 2.) Greene had been chair of plaintiffs' litigation department, and Hanlon had been responsible for over 500 client matters, and both had assumed fiduciary duties to plaintiffs. When the two abruptly resigned without notice, they left no status reports or lists of pending matters or deadlines on which they were working. Not only did they

employee's breach of fiduciary duty to the plaintiff. (*GAB, supra,* 83 Cal.App.4th at p. 425; *Bancroft-Whitney Co. v. Glen, supra,* 64 Cal.2d at pp. 352–353.)

leave without providing such information, they acted unlawfully to delete and destroy plaintiffs' computer files containing client documents and forms. Additionally, Hanlon and Greene misappropriated confidential information (see *post*, pt. B), improperly solicited plaintiffs' clients, and cultivated employee discontent. While the computer files and the confidential information all appear to have pertained to plaintiffs' clients, not their employees, and while Hanlon and Greene waited until after their resignations to offer jobs to plaintiffs' employees, we cannot conclude the trial court abused its discretion in finding that defendants' unlawful and unethical actions were designed in part to interfere with and disrupt plaintiffs' relationships with their key at-will employees.

In short, defendants did not simply extend job offers to plaintiffs' at-will employees. Rather, defendants purposely engaged in unlawful acts that crippled plaintiffs' business operations and caused plaintiffs' personnel to terminate their at-will employment contracts. Accordingly, the Court of Appeal properly upheld the award of $20,009.19 for damages attributable to that wrongful conduct.

### B. *Violations of the UTSA*

At trial, the court found that defendants violated the UTSA (Civ. Code, § 3426 et seq.) by misappropriating plaintiffs' confidential client list and, pursuant to Civil Code section 3426.3, subdivision (b), awarded plaintiffs $22,000 (representing a royalty fee of $10 for each of the 2,200 clients on the list). Defendants argue the Court of Appeal erroneously affirmed the trial court on this matter.

Under the UTSA, a client list qualifies as a "[t]rade secret" if it "[d]erives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use" and "[i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy." (Civ. Code, § 3426.1, subd. (d)(1), (2); see, e.g., *Morlife, Inc. v. Perry* (1997) 56 Cal.App.4th 1514, 1520–1522 [66 Cal.Rptr.2d 731].) A violation of the UTSA occurs when an individual misappropriates a former employer's protected trade secret client list, for example, by using the list to solicit clients (*American Credit Indemnity Co. v. Sacks* (1989) 213 Cal.App.3d 622, 632–633 [262 Cal.Rptr. 92] (*American Credit*)) or to otherwise attain an unfair competitive advantage (see *Morlife, supra*, 56 Cal.App.4th at p. 1523).

Here, defendants do not dispute that plaintiffs' client list derived independent economic value from not being generally known or that plaintiffs took reasonable efforts to maintain the list's secrecy under the circumstances.

Instead, defendants claim the trial court erroneously found violations of the UTSA based on their mailing of a professional announcement to the clients appearing on that list.

 Under defendants' authorities, although an individual may violate the UTSA by using a former employer's confidential client list to *solicit* clients, the UTSA does not forbid an individual from announcing a change of employment, even to clients on a protected trade secret client list. (*American Credit, supra,* 213 Cal.App.3d at pp. 634–636; see *Hilb, Rogal & Hamilton Ins. Services v. Robb* (1995) 33 Cal.App.4th 1812, 1821 [39 Cal.Rptr.2d 887]; accord, *MAI Systems Corp. v. Peak Computer, Inc.* (9th Cir. 1993) 991 F.2d 511, 521–522 [applying California law].) As one decision explains, merely announcing a new business affiliation, without more, is not prohibited by the UTSA definition of misappropriation because such conduct is "basic to an individual's right to engage in fair competition." (*American Credit, supra,* 213 Cal.App.3d at p. 636; cf. *Aetna Bldg. Maintenance Co. v. West* (1952) 39 Cal.2d 198, 204 [246 P.2d 11] [stating the common law rule].)

We have no quarrel with defendants' authorities, but find they support the trial court's determinations that defendants violated the UTSA by using the trade secret client data in an improper manner "to directly solicit clients" and for defendants' "own pecuniary gain to the detriment and damage of" plaintiffs. There is substantial evidence in the record supporting these findings, including testimony that defendants used the data to solicit a number of plaintiffs' clients directly by telephone. Additionally, there is substantial evidence showing that defendants' business announcement caused plaintiffs' clients, many of whom lacked fluency in English, to believe Reeves had died or his firm had gone out of business, and that plaintiffs had to conduct their own mail campaign to reassure clients their firm remained able to serve them.[9] Because defendants' conduct as such was not in furtherance of their right to engage in fair competition, the authorities they cite do not support a different result.

---

[9] Prior to defendants' departure, plaintiffs' firm went by the name of "Reeves and Hanlon, Professional Law Corporation." The business announcement defendants mailed out informed plaintiffs' clients of the formation of "Hanlon & Greene, A Professional Corporation," but made no mention of Robert Reeves's continuing practice.

 In recognition of the principle that the professional obligation of attorneys to their clients requires attorneys to provide for an orderly transition in the event of an employment change, Formal Opinion No. 1985-86 of the State Bar Standing Committee on Professional Responsibility and Conduct provides that departing attorneys should cooperate with their former employers to arrange for the issuance of a joint notice to clients. Here, defendants prepared and distributed their business announcement without seeking plaintiffs' input or approval.

## Disposition

The judgment of the Court of Appeal is affirmed.

George, C. J., Kennard, J., Werdegar, J., Chin, J., Brown, J., and Moreno, J., concurred.