Filed 2/4/21  Medipro Medical Staffing, LLC v. Certified Nursing etc. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| MEDIPRO MEDICAL STAFFING, LLC et al., | B294391 |
| Plaintiffs and Respondents, | (Los Angeles County Super. Ct. No. BC667851) |
| v. | |
| CERTIFIED NURSING REGISTRY, INC. et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Michael L. Stern, Judge.  Affirmed.

Khouri Law Firm, Michael J. Khouri and Behzad Vahidi for Defendants and Appellants.

Rosen Saba, Ryan D. Saba and Elizabeth L. Bradley for Plaintiffs and Respondents.

\* \* \* \* \* \*

Two high-ranking employees of a nurse staffing company, while still employed by that company, secretly recruited nurses for a competitor's staffing company. When the employees abruptly left to start up a new office for the competitor, their former employer sued them—and the competitor—for breach of fiduciary duty, fraud, and several other causes of action. A jury awarded the former employer over $3 million in lost profits and punitive damages. The employees and competitor appealed, challenging the verdict on a plethora of grounds, some of which are contrary to what they argued to the trial court. Because the general damages verdict rests upon at least one legally valid claim that is supported by substantial evidence and unaffected by any prejudicial error, we affirm the judgment.

## FACTS AND PROCEDURAL BACKGROUND

### I.      Facts

#### A.      *Nurse staffing industry, in general*

Hospitals typically employ fewer nurses than they would need if they were at full patient capacity; this built-in shortage is not a problem because, should there be a surge of patients, the hospitals can effectively "borrow" additional nurses on a temporary basis from a nurse staffing company.

The arrangement between a hospital and a nurse staffing company is fairly standardized: A hospital contracts in advance with one or more nurse staffing companies to obtain nurses of varying qualifications (registered nurses, licensed vocational nurses, and certified nursing assistants) for certain rates. The nurse staffing companies screen and hire nurses as their employees, and maintain the nurse-employees' names, contact information, shift and hospital preferences, and pay rates on their company's registry or roster. When a hospital anticipates a

2

shortage for a particular shift, it calls a nurse staffing company to get coverage for that particular shift and will sometimes request the more skilled and more dependable nurses by name. The nurse staffing company subsequently bills the hospital for any nurses it supplies on a shift-by-shift basis at the contractual rate, takes a cut off the top, and pays the remainder directly to the nurse.

Nurse staffing companies have what boil down to two types of employees—the so-called "staffers" who recruit and screen nurses for the company, and the nurses themselves. Although most nurses are simultaneously employed by multiple nurse staffing companies, most nurses prefer to work regularly with the staffers whom they regard as being "really good" and will typically not change their preferred nurse staffing company "unless ther[e is] interference with their existing relationship with such [company]."

In the nurse staffing industry, a nurse staffing company's roster or registry of nurses is its "number one asset." Nurses are the lifeblood of the company, and a registry populated with well-regarded nurses and setting forth their hospital and shift preferences and pay scales is "critical" to the staffing company's continued operation.

### B. *Medipro, generally*

#### 1. *Background*

Medipro Medical Staffing, LLC (Medipro) is a nurse staffing company. It was founded in 2011 by Alex Malcolm (Malcolm) and Luzvimin Labora (Labora). From 2011 through 2016, Labora was Medipro's chief executive officer and ran Medipro's day-to-day operations, which included hiring and firing staffers and nurses. During this time frame, Labora hired Larry

Greter (Greter) as a staffer and he became a "regional manager" for Medipro responsible for hiring nurses (but not staffers). Also during this time frame, Labora and Greter built up Medipro's registry of nurses, which included the nurses' names, contact information, nursing license, hospital and shift preferences, and their pay rates.

      2.     *January 2017 sale*

On January 5, 2017, Malcolm sold Medipro to McNair Zimbalist (Zimbalist) and Eli Pearlman (Pearlman) (collectively, the new owners) for $2.85 million. That transaction included Medipro's nurse registry.[1] Malcolm gave $400,000 of the sale price to Labora as a "bonus."

The new owners took efforts to protect their investment.

Prior to the purchase, the new owners asked Labora and Greter—who were at-will employees and whom the new owners wished to retain on an at-will basis—whether they intended to remain after the sale; both assured the new owners that they planned on staying until they retired.

After the purchase, and to reward them for their fealty, the new owners gave Labora the title of "President" of Medipro and gave Greter the title of "Vice President," although their duties did not change. To further entice them to remain with Medipro, the

---

1     Although Labora, Greter and others testified or argued below that the nurse registry belonged to *Labora* or *Greter* because they developed it while working for Medipro, this testimony and argument is contrary to California law, which unequivocally establishes that the fruits of an employee's labor belong to the employer (Lab. Code, § 2860). This includes employee and customer lists. (*Morlife, Inc. v. Perry* (1997) 56 Cal.App.4th 1514, 1526; *Courtesy Temp. Serv. v. Camacho* (1990) 222 Cal.App.3d 1278, 1287 (*Camacho*).)

new owners in April 2017 offered Labora and Greter an additional bonus contingent upon their remaining at Medipro for an additional year.

Immediately after the purchase, the new owners also asked Labora and Greter to sign three agreements.  Each signed an Employee Confidentiality Agreement, in which each (a) agreed that they had a "relationship of confidence and trust" with Medipro, (b) agreed not to "use, disclose, copy, distribute . . . or misappropriate" any of Medipro's "[p]roprietary [i]nformation," which included Medipro's "nurse lists and data," including the "names, addresses, compensation, specific capabilities, job assignments and performance evaluations" of nurses, (c) agreed, while employed by Medipro and for three years thereafter, not to "directly or indirectly[] hire any of [Medipro's] employees (including nurses) or solicit any of [Medipro's] employees and nurses to resign from their employment or terminate their relationship with" Medipro, and (d) agreed, "[a]t all times during [their] employment with" Medipro, not to "enter into or engage in any business that competes with" Medipro, to "solicit customers . . . [or] business . . . for any business that competes with" Medipro, or to "promote or assist . . . any person engaged in any business that competes with" Medipro.  Each signed a separate letter agreement in which each promised while employed by Medipro not to "engage in any other employment, occupation, consulting or other business activity directly related to the business in which Medipro is now involved."  And each signed an "outside activity disclosure," in which they represented that they were engaged in no "activities which could compete [with] or otherwise create a conflict of interest with [Medipro's] interests."

### C.  *Labora's and Greter's plan—and execution of that plan—to "raid" Medipro's business to aid a competitor*

Prior to working for Medipro, both Labora and Greter had worked for Certified Nursing Registry, Inc. (Certified), one of Medipro's direct competitors.  Certified was founded, owned and run by Cristina Sy (Sy).  Labora and Sy were "like . . . sister[s]."  Sy made it clear that both Labora and Greter had an "open offer" to return to Certified whenever they wanted.

At nearly the same time that they signed the three agreements with Medipro and assured the new owners that they were intending to stay until retirement, Labora and Greter were developing a plan to take Sy up on her open offer and to take Medipro's registry, as well as the best of Medipro's nurse employees, with them to Certified.  Within days and weeks of signing the agreements, Labora texted Greter, "We will stick together all the way with our job . . . . We have to talk to [Sy] what she can offer [sic]," and texted Greter and others that Sy had "higher rates," that Greter would depart Medipro with her, and that Medipro "will close down" if they left.  In March 2017, Labora told her niece—who worked at Medipro—of the plan to leave Medipro and "take all of the nurses with them."  And in July 2017, Labora later admitted to Medipro's new owners that her "plan all along" was to "go[] to Certified."

The plan had several phases.

Labora and Greter started by contacting nurses on Medipro's registry and informing them of their plan to leave for Certified, which was equivalent to asking those nurses to move to Certified with them.  They did this in March 2017.

Next, Greter was to depart Medipro to set up a new office for Certified in Glendale.  Greter orally agreed with Sy in mid-April 2017 to move to Certified, and on the basis of that

6

agreement, Sy leased new office space in Glendale.  In mid-May 2017, Sy took Greter and Labora out to dinner, where they finalized the terms of Greter's future employment with Certified. Two days later, Greter signed a written employment contract with Certified, which included an unprecedented $25,000 signing bonus to compensate for the bonus Greter would forfeit by leaving Medipro in less than a year.  Part of Greter's job was to "recruit for the . . . Glendale office," and his contract with Certified did not prohibit him from using Medipro's registry to do so.  As Labora and Greter had planned in March, Greter told Medipro he needed to go on medical leave in late May 2017 and, instead of getting knee surgery, he abruptly resigned from Medipro.  Less than a week later, Greter forwarded a copy of Medipro's nurse registry that he had previously sent to his personal email to his new email account at Certified.  Using the information in the registry, Greter called, texted, and emailed several nurses on Medipro's registry to inform them that he had moved to Certified and invited them to contact him at Certified. He started at Certified less than a week after he resigned from Medipro.  Nearly a month after that, Greter started contacting nurses from a list of nurses no longer registered with Certified.

Labora remained at Medipro for nearly two months after Greter departed, but advised him on how to get Certified's new office up and running, and fed him information about what was happening at Medipro.  During Greter's first week at Certified, Labora advised Greter not to contact a nurse who was particularly "close" with one of the new owners, not to immediately "book[]" "hospitals" that regularly contacted Medipro, and to start by reaching out to "the least obvious nurses."  During Greter's second week at Certified, Labora told

7

Greter that the new owners had learned of Greter's movement to Certified and were going to send a letter to Sy advising her of Greter's contractual promise not to use Medipro's nurse registry while employed by Certified. Labora referred at least two nurses and one of Medipro's staffers to Certified in June and July 2017. And in mid-July, Labora informed Greter that Medipro had started using new computer software to manage its registry, and disclosed the name of that software.

With Greter settled in at Certified, Labora then prepared *her* departure. After Greter had orally agreed with Sy to leave for Certified in April, Labora emailed a copy of Medipro's registry to her personal iCloud account. In mid-July 2017, Labora falsely told the new owners she planned to *retire* in two weeks. Tellingly, she forwarded her notice to Greter. Two days before her scheduled last day, the new owners conducted an exit interview. Right after that interview, Labora lost her temper, blurted out what her "plan all along" had been, and abruptly resigned. A week later, Labora reported for duty at Certified's new Glendale office. On her first day, she signed a written contract with Certified, and received an unprecedented $50,000 signing bonus. Labora's contract, like Greter's, also did not prohibit her from using Medipro's registry in her work for Certified.

From January through July 2017, Labora and Greter took great efforts to conceal their plan and to protect Certified and Sy. When the new owners asked Labora and Greter in late March 2017 whether there was any truth to what Labora's niece had told them about their plan to leave, both vehemently denied any such plan. In early May 2017, Labora sent Greter an email reminding them that "We have to have [an] alibi" for Sy. Both

8

Labora and Greter attempted to wipe clean all of the data on the company phones they used to communicate about their plan. When the new owners asked Labora if she knew about Greter's plan to go to Certified after he left, Labora denied knowing of the plan—or even where he had gone. And, of course, neither Labora nor Greter told the new owners of their plan until Labora's outburst after her exit interview.

### D. *The fallout from Labora's and Greter's plan*

Once executed, Labora's and Greter's plan had a devastating effect on Medipro. Forty of the "most loyal," "most" "reliable" and most employed nurses on Medipro's registry, and who had not worked for Certified in at least the first six months of 2017, signed up with Certified once Greter and Labora started at Certified. The departure of these high-profile nurses caused a "snowball effect," as other nurses began to wonder what was "wrong" with Medipro. Medipro's registry went from 155 nurses at the beginning of 2017 to 37 nurses at the end.

This translated to past lost profits of $1,534,961, and future lost profits of $1,007,238.

## II. Procedural Background

### A. *Pleadings*

On July 10, 2017, which was just four days before Labora gave her two weeks' notice to leave, Medipro sued Certified and Greter.

After Labora abruptly quit and admitted her "plan all along," Medipro filed a first amended complaint against Labora, Greter, Certified and Sy (collectively, defendants).[2] Medipro sued

---

[2] Medipro also sued Malcolm, although Malcolm settled right before trial. Medipro also listed Medipro Financial, LLC as a second plaintiff.

Labora and Greter for (1) fraud, through intentional misrepresentation, negligent misrepresentation, concealment, and false promise, (2) breach of fiduciary duty and the duty of loyalty, (3) breach of their employment agreements as well as the implied covenant of good faith and fair dealing, (4) intentional and negligent interference with the prospective economic advantage Medipro had with nurses on its registry, and (5) unfair competition, both at common law and under Business and Professions Code section 17200. Medipro sued Certified and Sy for (1) aiding and abetting Labora's and Greter's breach of fiduciary duty and the duty of loyalty, (2) inducing Labora's and Greter's breach of contract, (3) intentional interference with the employment contracts between Medipro and Labora and Greter, (4) intentional and negligent interference with the prospective economic advantage Medipro had with nurses on its registry, and (5) unfair competition, both at common law and under Business and Professions Code section 17200.

With regard to the breach of fiduciary duty and the duty of loyalty claim, Medipro more specifically alleged that the breach was effected by Labora and Greter (1) "concealing the plans from [their] superiors, falsely informing [their] superiors that there was no . . . plan[]" "to solicit and raid Medipro's employees and staff," (2) "falsely promising [their] superiors that [they] would consider a new employment agreement in an effort to delay mitigating action," (3) "failing to protect Medipro's interests with knowledge of Certified's recruitment efforts," and (4) "soliciting Medipro employees to resign with [them]."

With regard to the fraud-related claims, Medipro more specifically alleged that Labora and Greter had committed fraud by (1) "affirmatively misrepresenting" and promising Medipro

10

that "there was no imminent scheme to misappropriate Medipro's confidential and trade secret information" (namely, Medipro's nurse registry) "and to raid Medipro's employees and customers," when in fact they knew or should have known there was a scheme, (2) "failing to disclose the existence of such a scheme, even when asked," and (3) "representing . . . that [they were] not assisting [one another] or Certified, when [they were] in fact planning to resign and take confidential and trade secret information to" Certified.

## B. *Trial*

After the trial court denied summary judgment to defendants, the matter proceeded to a six-day jury trial. At trial, Labora and Greter testified that they spontaneously decided to leave Medipro on their own and denied ever recruiting any nurses on Medipro's registry to work for Certified. Sy denied that she ever encouraged Labora or Greter to come work at Certified, and denied asking them to use Medipro's registry. All three witnesses were repeatedly impeached with inconsistent testimony from their pretrial depositions. Labora's niece backtracked as to what she told the new owners in March 2017, but was impeached by her prior deposition testimony and by evidence that Labora was "furious" with her for reporting her plan to the new owners and that Labora had subsequently threatened her. In their defense, defendants called five nurses who testified that they had moved from Medipro to Certified without any encouragement from Labora or Greter, but all five admitted that they were testifying as a favor to Labora, whom they regarded as a "personal friend" or "sister."

The jury returned a 53-question special verdict on liability and a general verdict on damages. The jury found all of the

11

defendants liable on all of the counts in which they were named. The jury also awarded Medipro lost profits damages of $2.5 million—with $150,000 against Greter, $400,000 against Labora, $200,000 against Sy, and $1.75 million against Certified. After a brief punitive damages trial, the jury imposed punitive damages of $100,000 against Labora, $250,000 against Sy and $250,000 against Certified.

After the entry of judgment, defendants filed motions for new trial, for judgment notwithstanding the verdict and for clarification of the judgment. The trial court denied all of the motions.

Defendants then filed this timely appeal.[3]

## DISCUSSION

In this appeal, defendants urge us to invalidate the verdict on several grounds, including some that were explicitly disavowed before the trial court. Where, as here, the verdict is a general verdict that rests upon ""several counts"" and the jury was properly instructed not to award duplicative damages, we must uphold the verdict as long as ""a single one of such counts . . . is supported by substantial evidence and is unaffected by error'" [Citations.]" (*Wysinger v. Automobile Club of Southern California* (2007) 157 Cal.App.4th 413, 427 (*Wysinger*).)

## I.    Substantial Evidence Supports the Verdict

A verdict is supported by substantial evidence if the whole record, viewed in the light most favorable to the verdict, contains evidence that is reasonable, credible and of solid value sufficient to support that verdict. (*People v. Boyce* (2014) 59 Cal.4th 672, 691; *Marshall v. Dep't of Water & Power* (1990) 219 Cal.App.3d

---

[3]    Following the filing of the notice of appeal, the trial court entered an amended judgment that added costs.

1124, 1141.)  In undertaking this inquiry, we "indulge . . . all reasonable inferences" and resolve all credibility findings "in support of the trial court's order."  (*Hilb, Rogal & Hamilton Ins. Services v. Robb* (1995) 33 Cal.App.4th 1812, 1820; *City of El Monte v. Ramirez* (1982) 128 Cal.App.3d 1005, 1011-1012.)

We conclude that at least five of the counts against Labora and Greter, and one of the counts against Sy and Certified, are supported by substantial evidence.[4]

**A.** *Breach of fiduciary duty and breach of the duty of loyalty (against Labora and Greter)*

To prevail on a claim for breach of fiduciary duty or breach of the duty of loyalty, the plaintiff must establish (1) "'existence of a fiduciary duty'" or a duty of loyalty, (2) "'breach of th[at] . . . duty,'" and (3) "'damage proximately caused by the breach.'" (*Williamson v. Brooks* (2017) 7 Cal.App.5th 1294, 1300 [elements for breach of fiduciary duty claim]; *Huong Que, Inc. v. Luu* (2007) 150 Cal.App.4th 400, 410 (*Huong Que*) [same elements, for breach of the duty of loyalty].)

Substantial evidence supports the jury's findings that Labora and Greter owed Medipro a fiduciary duty and a duty of loyalty.  Although not every employee owes his or her employer a fiduciary duty (e.g., *Amid v. Hawthorne Cmty. Medical Group* (1989) 212 Cal.App.3d 1383, 1391), employees who are "[c]orporate officers and directors" or who otherwise "participate[] in [the] management of the corporation" by "exercising some discretion[]" to "'manage [its] day-to-day operations'" owe a fiduciary duty to their employer.  (*Bancroft-Whitney Co. v. Glen*

---

4       Indeed, because the unfair competition counts are wholly derivative, the validity of the breach of duty and fraud-related counts also supports the unfair competition counts.

13

(1966) 64 Cal.2d 327, 345 (*Bancroft-Whitney*); *Gab Bus. Servs. v. Lindsey & Newsom Claim Servs.* (2000) 83 Cal.App.4th 409, 420-421, overruled on other grounds as stated in *Reeves v. Hanlon* (2004) 33 Cal.4th 1140 (*Reeves*).) Employees who owe a fiduciary duty also owe a duty of loyalty. (*Huong Que*, *supra*, 150 Cal.App.4th at p. 414 [holding that *all* employees owe a duty of loyalty to their employer].) Labora and Greter were high-ranking corporate officers of Medipro—namely (and respectively), its President and Vice President. More to the point, Labora ran Medipro's day-to-day operations prior to its sale in January 2017 and her job duties remained the same thereafter. Greter also hired and fired its nurse-employees.

Substantial evidence supports the jury's finding that Labora and Greter breached their fiduciary duty and their duty of loyalty to Medipro. An employee breaches his or her fiduciary duty to the employer by "enter[ing] into a competing enterprise which cripples or injures [the] business . . . of which he [or she] remains an officer or director" (*Sequoia Vacuum Systems v. Stransky* (1964) 229 Cal.App.2d 281, 286), and by concealing that activity—either through nondisclosure or through affirmative lies (*Daniel Orifice Fitting Co. v. Whalen* (1962) 198 Cal.App.2d 791, 800; *Bancroft-Whitney*, *supra*, 64 Cal.2d at pp. 347-348). An employee breaches his or her duty of loyalty by "tak[ing] action which is inimical to [the employer's] best interests." (*Huong Que*, *supra*, 150 Cal.App.4th at p. 414.) While neither duty is breached by "preparing to compete with [one's] employer" (*Mamou v. Trendwest Resorts, Inc.* (2008) 165 Cal.App.4th 686, 719, italics omitted), that preparatory activity ripens into a breach once the employee "use[s] his or her [employer's] time, facilities or proprietary secrets to build the competing business"

14

(*Techno Lite, Inc. v. Emcod, LLC* (2020) 44 Cal.App.5th 462, 473 (*Techno Lite*)).  Labora and Greter breached their fiduciary duty and duty of loyalty to Medipro when they—while still employed by Medipro—reached out to nurses employed by Medipro to urge them to follow them to Certified, emailed a copy of Medipro's nurse registry to their personal accounts, and then repeatedly lied to Medipro's new owners when confronted about their activities.  These acts went far beyond "preparing to compete."

Lastly, substantial evidence supports the jury's finding that these breaches proximately caused Medipro to lose profits from 2017 through 2022.

### B.    *Fraud-related claims (against Labora and Greter)*

To prevail on any of the four types of fraud claims Medipro asserts in this case (fraud by intentional or negligent misrepresentation, concealment, or promissory fraud), the plaintiff must establish (1) the defendant made a ""'misrepresentation'"" through a ""'false representation, concealment, or nondisclosure,'"" (2) the defendant either knew of the falsity (for intentional misrepresentation, concealment or promissory fraud) or should have known of the falsity (for negligent misrepresentation) of the statement, (3) the defendant acted with ""'the intent to defraud, i.e., to induce reliance,'"" (4) the plaintiff justifiably relied on the misrepresentation, and (5) resulting damage.  (*Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 974; *Bily v. Arthur Young & Co.* (1992) 3 Cal.4th 370, 407-408.)

Substantial evidence supports the jury's findings that each of these elements was met.  On numerous occasions, and while still employed by Medipro, Labora and Greter affirmatively told Medipro's new owners that they were not in talks with Certified,

were not recruiting Medipro's nurses, and were not copying Medipro's registry for their future use while at Certified; at the same time, they concealed the truth.

### C. *Aiding and abetting Labora and Greter's breach of fiduciary duty and duty of loyalty (against Sy and Certified)*

To prevail on a claim that a defendant has aided and abetted a third party to commit an intentional tort, the plaintiff must establish that (1) the defendant "knows [the third party's] conduct constitutes a breach of duty," and (2) "gives substantial assistance or encouragement to the [third party] to so act." (*American Master Lease LLC v. Idanta Partners, Ltd.* (2014) 225 Cal.App.4th 1451, 1475.)

Substantial evidence supports the jury's verdict that Sy (and, by extension, Certified) knew of Labora's and Greter's breaches of their fiduciary duty and duty of loyalty to Medipro and substantially encouraged those breaches. Sy was like a "sister" to Labora and was long-time friends with Greter; Sy knew Labora's and Greter's high-ranking positions at Medipro and had extended them an "open offer" to return; Sy and Labora spoke dozens of times a month in early 2017; Sy, Labora and Greter went to dinner in May 2017 to finalize Greter's imminent departure from Medipro and his arrival at Certified; Sy sweetened the proverbial pot by opening up a new office just for Labora and Greter to run and by offering them a starting bonus that no other Certified employee had previously been offered, ostensibly to make up for the money they would lose from not getting a contractual loyalty bonus from Medipro; Sy took no action whatsoever to prohibit Labora and Greter from using Medipro's registry to recruit nurses for Certified; and by the end of 2017, 40 of Medipro's most reliable and sought-after nurses

16

had left Medipro to move to Certified. From the close relationship of Sy, Labora and Greter as well as the acts outlined above, the jury could reasonably infer that Sy knew precisely what Labora and Greter were doing and encouraged them to do it.

Sy and Certified suggest that they are nevertheless immune from liability because Labora and Greter were at-will employees of Medipro, free to depart whenever they wanted without rendering Sy and Certified liable for that departure. While "'it is not ordinarily a tort to hire the [at-will] employees of another for use in the hirer's business' [citation]" (*Reeves*, *supra*, 33 Cal.4th at p. 1149), that maxim only applies where "'such competition is fairly and legally conducted' [citation]" (*ibid.*). Here, it was not, as the evidence supports the jury's finding that Sy (and Certified) actively encouraged Labora and Greter to violate their duties to Medipro and to raid Medipro of its chief asset—namely, its registry and the nurses on it. That Labora and Greter happened to be at-will employees does not excuse this tortious conduct.

*     *     *

In their briefs on appeal, defendants seemingly urge us to (1) come to a different conclusion regarding the claims discussed above in light of conflicting evidence, and (2) evaluate whether substantial evidence underlies Medipro's remaining claims.[5] We

---

[5] Defendants do not challenge the jury's finding that they acted with sufficient malice, oppression or fraud to warrant punitive damages. Substantial evidence supports this finding in any event. What is more, punitive damages are legally available for each of the claims we have found to be supported by substantial evidence. (Civ. Code, § 3294, subd. (a) [punitive

17

reject defendants' first argument because it urges us to do something substantial evidence review does not allow—that is, to reweigh the evidence. (*People v. Brown* (2014) 59 Cal.4th 86, 106 ["[w]e do not reweigh evidence"].) We reject defendants' second argument for two reasons. To begin, doing so is unnecessary because a single valid claim is sufficient to uphold a general damages verdict (*Wysinger*, *supra*, 157 Cal.App.4th at pp. 426-427); here, we have found five valid claims against Labora and Greter (and possibly seven, if we include the derivative unlawful business practices claims), and one such valid claim against Sy and Certified (and possibly three, if we include the derivative unlawful business practices claims). No more is needed. Further, defendants have not properly presented their substantial evidence challenge for our review. Defendants assert that "no evidence" supports several of the jury's findings, but their briefs summarize the facts in the light most favorable *to them* by ignoring much of the evidence supporting the verdict and by going so far as to refer to evidence excluded by the trial court (without any accompanying argument as to why that exclusion was wrong). This constitutes a waiver of the issue. (*State Farm Fire & Casualty Co. v. Jioras* (1994) 24 Cal.App.4th 1619, 1625, fn. 4.)

## II.    The Verdicts Are Unaffected By Error

Defendants raise what boil down to three categories of attacks on the fraud, breach of duty, and aiding and abetting claims we have found to be supported by substantial evidence: (1) they are legally barred, (2) they are infected with evidentiary error, and (3) they are infected with instructional error.

---

damages are available "[i]n an action for the breach of an obligation not arising from contract"].)

### A.    *Legal bars*

In their briefs on appeal, defendants construct a "heads we win, tails you lose" argument that was never raised below.  It goes something like this:  (1) All of Medipro's tort claims are *really* claims that defendants misappropriated a trade secret (namely, Medipro's nurse registry), such that those claims are all displaced by California's Uniform Trade Secrets Act (Civ. Code, § 3426 et seq.) (the Act), *but* (2) Medipro's nurse registry is not *actually* a trade secret, so all of Medipro's tort claims—as well as its contract-based claims—are barred by Business and Professions Code section 16600's prohibition of lawsuits that would prevent employees (here, Labora and Greter) "from engaging in [their] lawful profession."  Because neither component of this argument holds water, the whole thing sinks.

#### 1.    *Displacement by the Act*

Defendants' argument that all of Medipro's claims (except their breach of contract-related claims) are displaced—and hence invalidated—by the Act is without merit for three reasons.

##### a.    The argument is waived

Defendants' argument is waived.  Defendants repeatedly took the position before the trial court that "[t]his is not a trade secret case."  They cannot now turn around and assert that it is. (*In re Griffin* (1967) 67 Cal.2d 343, 348 [parties may not "'trifle with the courts'"]; see also *Owens v. County of Los Angeles* (2013) 220 Cal.App.4th 107, 121 [discussing doctrine of judicial estoppel].)

##### b.    The argument is without merit

The Act provides remedies for the misappropriation of trade secrets (Civ. Code, § 3426 et seq.), but specifically preserves (1) "contractual" and "criminal remedies, whether or not based

upon misappropriation of a trade secret," and (2) "other civil remedies *that are not based upon misappropriation of a trade secret*" (*id.*, § 3426.7, subd. (b), italics added). By negative implication, the italicized language has been read to "'implicitly [displace] alternative civil remedies based on trade secret misappropriation.'" (*K.C. Multimedia, Inc. v. Bank of America Technology & Operations, Inc.* (2009) 171 Cal.App.4th 939, 954 (*K.C. Multimedia*).) As to these alternative civil remedies, the Act "occupie[s] the field" and "supersede[s] other causes of action even" if the Act "does not itself provide relief on a particular set of facts" because the proprietary information at issue does not meet the Act's definition of a trade secret. (*Silvaco Data Systems v. Intel Corp.* (2010) 184 Cal.App.4th 210, 234, 237 (*Silvaco*), overruled on other grounds as stated in *Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310; *Erhart v. Bofi Holding, Inc.* (S.D. Cal. 2020) 2020 U.S. Dist. LEXIS 57137, at *103-*104.) Consistent with this mandate, the Act displaces another civil remedy only if that remedy "hinges upon," is "predicated on," "rests squarely on," or is "based entirely on" allegations that a trade secret was misappropriated. (*K.C. Multimedia*, at pp. 955, 959, 962; *Silvaco*, at p. 236.) In other words, the Act "does not displace noncontract claims that, although related to a trade secret misappropriation, are independent and based on facts distinct from the facts that support the misappropriation claim." (*Angelica Textile Services, Inc. v. Park* (2013) 220 Cal.App.4th 495, 506 (*Angelica Textile*); *Chromadex, Inc. v. Elysium Health, Inc.* (C.D. Cal. 2019) 369 F.Supp.3d 983, 989; cf. *K.C. Multimedia*, at p. 955 [displacement reaches only claims "'based on the same nucleus of facts as the misappropriation of trade secrets claim . . . '"].)

20

The Act does not displace any of the claims upon which we have relied to sustain the general damages verdict. The Act does not displace Medipro's breach of fiduciary duty and duty of loyalty claim because that claim turns on Labora's and Greter's acts, while still employed by Medipro, of contacting Medipro's nurses to encourage them to follow them to Certified, of e-mailing themselves the registry, and of concealing their competitive activities from Medipro's new owners. While this claim rests *in part* upon taking Medipro's registry for themselves, the claim rests on other conduct as well, as a consequence, does not "hinge[] upon," is not "predicated on," does not "rest[] squarely on," and is not "based entirely on" the taking of the registry. (Accord, *Officia Imaging, Inc. v. Langridge* (C.D. Cal. 2018) 2018 U.S. Dist. LEXIS 226887, at *23-*24 [breach of loyalty claim not displaced by Act].) The Act does not displace Medipro's fraud-related claims against Labora and Greter either because those claims turn on their deception of Medipro's new owners regarding their plan to leave Medipro for Certified and their ongoing execution of that plan. While that plan in part involved taking Medipro's registry, the plan involved far more; more to the point, the gravamen of the claim was *their deception*, not their misappropriation of the registry. And the Act does not displace Medipro's claim against Sy and Certified for aiding and abetting Labora's and Greter's acts because that claim turns on Sy and Certified's knowledge—and encouragement—of what Labora and Greter were doing. The fact that the misappropriation of the registry was relevant to the calculation of damages for these claims is of no moment because displacement turns on the basis for liability, not for damages. (*Silvaco*, *supra*, 184 Cal.App.4th at p. 242.) Defendants assert that Medipro is judicially estopped

21

from denying that its registry is a trade secret because it so alleged in its operative complaint, but Medipro's allegation—even if accepted as gospel—does not affect the basis for its tort claims; as a result, defendants' assertion does not alter our displacement analysis.

### c.       Any error was not prejudicial

Even if we assume that Medipro should have been required to allege its various tort claims as a single claim for misappropriation of trade secrets under the Act, this error did not prejudice defendants because Medipro would have prevailed on its misappropriation claim and that claim would have supported the damages the jury awarded in this case.

Medipro would have prevailed on a claim for misappropriation under the Act because (1) its nurse registry constituted a "trade secret" within the meaning of the Act, and (2) defendants' use of the registry constituted "misappropriation." The Act defines a "trade secret" as "information" that (1) "[d]erives independent economic value . . . from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use";  and (2) "[i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy."  (Civ. Code, § 3426.1, subd. (d).)  Medipro's nurse registry contains not only the names and contact information of Medipro's nurses, but also their credentials, their hospital and shift preferences, and their pay rates with Medipro. As a result, it constitutes a trade secret.  (*ReadyLink Healthcare v. Cotton* (2005) 126 Cal.App.4th 1006, 1019-1020 ["'a customer list procured by substantial time, effort, and expense is a protectable trade secret'"]; *Camacho, supra*, 222 Cal.App.3d at p. 1287 [same]; cf. *Moss, Adams & Co. v. Shilling* (1986) 179

22

Cal.App.3d 124, 130 [names and publicly available contact information alone not a trade secret].) Indeed, the registry is Medipro's "number one asset." Medipro also undertook efforts to maintain its secrecy by requiring Labora and Greter to sign confidentiality agreements. (*Whyte v. Schlage Lock Co.* (2002) 101 Cal.App.4th 1443, 1454 ["Requiring employees to sign confidentiality agreements is a reasonable step to ensure secrecy"].) Defendants' "us[e of] the list to solicit [nurses]" constitutes misappropriation. (*Reeves*, *supra*, 33 Cal.4th at p. 1155.)

The Act would have also supported the damages award in this case. The Act provides for compensatory damages corresponding with "actual loss" (Civ. Code, § 3426.3, subd. (a)), and damages for lost profits are a component of actual loss (see *Cellphone Termination Fees Cases* (2011) 193 Cal.App.4th 298, 304). The Act also provides for punitive damages as long as they do not "exceed[] twice" the compensatory damages award. (Civ. Code, § 3426.3, subd. (c).) Here, the punitive damages award of $600,000 is far less than the $2.5 million compensatory damages award.

> 2.    *Preclusion by Business and Professions Code section 16600*

Defendants' argument that Medipro's claims are all barred by Business and Professions Code section 16600 lacks merit.

Business and Professions Code section 16600 provides that "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." (Bus. & Prof. Code, § 16600.) Except in narrow circumstances involving the sale of goodwill or corporate shares, dissolution of a partnership or limited liability corporation (*id.*, §§ 16601, 16602, 16602.5), or where the former employee is using

23

"the former employer's trade secrets to unfairly compete with the former employer" (*The Retirement Group v. Galante* (2009) 176 Cal.App.4th 1226, 1237), this provision renders "[a]greements not to compete *after the termination of employment . . .* invalid without regard to their reasonableness." (*Ixchel Pharma, LLC v. Biogen, Inc.* (2020) 9 Cal.5th 1130, 1152, italics added; *AMN Healthcare, Inc. v. Aya Healthcare Services, Inc.* (2018) 28 Cal.App.5th 923, 936-946 [applying Business and Professions Code section 16600 to *former* employees of a nurse staffing company].) But this provision "does not affect limitations on an employee's conduct or duties *while employed.*" (*Techno Lite, supra*, 44 Cal.App.5th at p. 471; *Angelica Textile, supra*, 220 Cal.App.4th at p. 509.) Here, the breach of duty and the fraud claims we have concluded support the general damages verdict in this case all involved defendants' conduct while Labora and Greter were still employed by Medipro. Thus, the prohibitions embodied in Business and Professions Code section 16600 are inapplicable. (*Techno Lite*, at p. 473 [purpose of section 16600 "is not to immunize employees who undermine their employer by competing with it while still employed"].)

## B. *Evidentiary rulings*

Defendants challenge four of the trial court's evidentiary rulings. We review those rulings for an abuse of discretion. (*Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 281.)

### 1. *Admission of Labora's and Greter's employment agreements with Medipro*

Defendants argue that the trial court erred in admitting the employment agreements Labora and Greter signed with Medipro in January 2017 because, in their view, the agreements are void under Business and Professions Code section 16600. For the reasons noted above, this provision is irrelevant to the breach

24

of duty and fraud-related claims that support the general verdict for damages because the facts underlying those claims all occurred while Labora and Greter were still employed by Medipro. To be sure, the portion of the agreement prohibiting them from contacting Medipro's nurses for three years *after* they left Medipro may be problematic under Business and Professions Code section 16600. But that portion is doubly irrelevant because (1) it has no effect *while* they are still employed by Medipro, and (2) contrary to what defendants represent in their briefs on appeal, the agreements have a severability clause that would excise this provision and leave intact the portions prohibiting misuse of Medipro's proprietary information while still employed by Medipro.

> 2. *Admission of Labora's and Greter's prior felony convictions*

Defendants contend that the trial court erred in ruling that Medipro could elicit the fact that Labora and Greter had each been convicted of a felony—but that defendants could not elicit *which* felonies or *when*. Based on this ruling, Medipro elicited that Labora had been convicted of "a felony in the last 10 years" and that Greter had been convicted of felony driving under the influence (DUI).

The trial court did not abuse its discretion in admitting Labora's sanitized felony conviction and Greter's felony DUI conviction to impeach them. A trial court may admit a witness's prior felony conviction as grist for impeachment of the witness's credibility after considering (1) "whether the prior conviction reflects adversely on [the witness's] honesty or veracity," (2) whether the prior conviction is near or remote in time, (3) "whether the prior conviction is for the same or substantially similar conduct [at issue in the current litigation]," and (4)

25

whether admission of the conviction will deter the witness from testifying. (Evid. Code, §§ 352, 788; *People v. Mendoza* (2000) 78 Cal.App.4th 918, 925.) Both Labora's 2009 conviction for a drug-related felony[6] and Greter's 2015 conviction for *felony* DUI involve crimes of moral turpitude that reflect adversely on those witnesses' honesty or veracity (*People v. Forster* (1994) 29 Cal.App.4th 1746, 1756 [felony DUI]; *People v. Harris* (2005) 37 Cal.4th 310, 337 [felony drug possession for sale]), both convictions are relatively recent in time, and both convictions are for conduct unlike the conduct involved in this case, which renders them less likely to deter Labora or Greter from testifying. Although defendants offer a different way to balance these factors, the trial court's decision to admit these convictions, and to sanitize them, was not an abuse of discretion and we are not at liberty to reweigh the factors. Defendants also argue that the trial court erred in not definitively ruling on the issue until *after* the parties' opening statements, thereby preventing defendants from "fronting" the convictions before they were elicited by Medipro. But defendants have failed to provide any authority requiring a trial court to make its necessarily provisional in limine rulings in order to facilitate a party's opening statement.

Even if the trial court erred in its ruling or in the timing of its ruling, it is not reasonably probable that this error would have affected the outcome of the trial. (*People v. Cardenas* (1982) 31 Cal.3d 897, 907.) Labora and Greter were substantially

_____

6      Although defendants' motion in limine on this subject represented that Labora suffered her conviction in 2006, at trial the parties represented that it occurred in 2009. There is no evidence on the nature of her drug-related felony (that is, whether it is for transportation or possession for sale).

impeached by their prior deposition testimony and by their text messages; the admission of their prior convictions, which were only fleetingly mentioned, had no appreciable effect on their otherwise damaged credibility.

3. *Failure to admit Labora and Greter's testimony regarding their reasons for leaving Medipro and the sameness of their job duties*

Defendants assert that the trial court erred in not allowing Labora and Greter to testify about their reasons for leaving Medipro, which would have shown that they left—not as part of a secret plan to help Certified—but because they were unhappy with how Medipro's new owners were running Medipro and were merely exercising their right, as at-will employees, to pursue other employment. This assertion lacks merit for the simple reason that Labora and Greter *were* allowed to testify as to their reasons for leaving Medipro: Both Labora and Greter testified that the new owners did not "interact with" and were "cold" to Medipro's nurses on a personal level, and that the new owners wanted to have Medipro's nurses engage in what Greter viewed as "unethical" behavior by having them look at hospitals' sign-in sheets for names of non-Medipro nurses to solicit; Greter also testified that he otherwise had "trust issues" with the new owners.

Defendants relatedly assert that Labora and Greter were not permitted to testify how their job duties had remained the same despite their new corporate titles after the new owners purchased Medipro. This assertion is contrary to the record because both Labora and Greter *were* permitted to testify that their job duties had not changed. Although the trial court did not allow Labora to testify as to whether she was able to hire Medipro employees, her answer was already before the jury:

27

Malcolm had testified that Labora could hire and fire employees when he owned the company, and Labora testified her job duties had not changed.  Being denied the opportunity to elicit evidence that is already before the jury is neither error nor prejudicial.

        4.     *Refusal to allow testimony by defendants' rebuttal expert witness*

Defendants argue that the trial court erred in excluding some testimony by their rebuttal expert witnesses on damages.

To support its claim for damages, Medipro called an economist as an expert witness.  The economist explained how he calculated the profits Medipro lost by virtue of the migration of most of Medipro's nurses to Certified.  He attributed all of that migration to the defendants' actions:  Starting with the stipulated fact that 40 nurses who had worked for Medipro and not for Certified prior to Labora's and Greter's departure moved to Certified *after* Labora and Greter departed, and relying on other testimony that those were the "highest-producing" and "most-respected nurses," the economist opined that the departure of those 40 nurses had a "snowball effect" that prompted many other nurses to migrate and thus resulted in Medipro's nurse registry dropping from 155 nurses at the beginning of 2017 to 37 at the end of the year.  To calculate Medipro's *past* lost profits from this loss of nurses, the economist estimated that Medipro's profits in 2017 and 2018 (up to the point of the trial in 2018) in the absence of defendants' misconduct would have been 10 percent *less* than they were in 2016, which the economist explained was a "reasonable" and "conservative" estimate given that Medipro had *grown* by 40 percent between 2015 and 2016.  To those expected profits, he compared Medipro's *actual* losses in 2017 and 2018, and from that concluded that the sum of the lost profits for those two years totaled $1,534,961.  To calculate *future*

lost profits, the economist estimated that Medipro's profits in 2019, 2020, 2021 and 2022 in the absence of defendants' misconduct would have remained the same as the profits he estimated in the absence of misconduct for 2017 and 2018 (that is, at 10 percent *below* Medipro's profits in 2016). He then estimated what Medipro's profits would be in light of defendants' misconduct by starting with what its actual profit/loss was in 2018 and then calculating that Medipro's profits in 2019, 2020, 2021, 2022 would, in actuality, grow by 12 percent each year from what they were in the prior year, which the economist explained was a "reasonable" and "conservative" estimate given that Medipro's profits had increased by 15 percent between 2017 and 2018. The economist stopped calculating future lost profits in 2022 because, by that time, Medipro's actual future profits would equal what he estimated they would have been in the absence of misconduct. Discounted to present value, the future lost profits came to $1,007,238.

Defendants introduced evidence to undermine the economist's analysis. Greter testified that the drop in Medipro's profits had started prior to his and Labora's departure, and was partly attributable to changes in the contracts with three of the hospitals Medipro serviced. Defendants also called their own economist, but solely as a rebuttal expert (because they had not designated him as an expert prior to trial). Defendants' expert testified that Medipro's economist overstated the lost profits because, in his view, (1) Medipro's nurse registry—and its revenues—started to shrink *before* Labora and Greter left, (2) there was no "snowball effect," (3) Medipro's economist was wrong to assume Medipro's profits in the absence of wrongdoing would only be 10 percent less than 2016 because Medipro should

29

not have expected its business to continue *at all* after its at-will employees departed, (4) Medipro's economist was wrong to calculate future profits out to 2022 because it was "too long of a damages period," (5) Medipro's economist should have used a methodology that the economist had revealed prior to trial but did not rely on at trial, and (6) Medipro's economist's analysis "did not line up with the facts" and "did not line up with the methodologies" of his profession.

Despite all of this evidence introduced to call into question the testimony of Medipro's economist, defendants argue that the trial court erred in not allowing their rebuttal expert to testify about (1) the errors in the methodology the economist opted not to rely upon, and (2) *why* the economist erred in not factoring in the changes to Medipro's contracts with its hospitals. Even if we assume for the sake of argument that these rulings were error, it is not reasonably probable that they would have affected the outcome of the trial. The outcome of the trial could not be affected by whether or why defendants' expert disagreed with a theory that Medipro's economist never presented to the jury. And it is not reasonably probable that the outcome of the trial was affected by the absence of an explanation as to *why* Medipro's economist should have factored in possible changes to hospital revenue: The economist testified on cross-examination that Medipro's revenue was driven chiefly by the number of available nurses in its registry, and defendants' expert testified to his belief that this was wrong; the *why* of it was not critical, particularly when this factor was only one of many factors on which the two experts disagreed and the jury, by awarding actual damages in the approximate amount calculated by Medipro's economist,

30

necessarily credited the economist's testimony over defendants' expert's testimony.

### C. *Instructional rulings*

Defendants challenge two of the trial court's rulings on jury instructions. We review such challenges de novo. (*Evans v. Hood Corp.* (2016) 5 Cal.App.5th 1022, 1045.)

1. *Instruction regarding announcing new employment*

Defendants asked the trial court to instruct the jury that "An employee has the right to announce their new employment *to clients on a protected trade secret customer list. Even if the employee is under a duty to limit their use of trade secret information, such a duty does not prohibit the employee from sending announcements to clients*." (Italics added.) The trial court instructed the jury with the non-italicized portion of the instruction after finding the italicized portion to be "argument."

We conclude the trial court's ruling was not prejudicial error. It was not error because the trial court properly instructed the jury on the legal principle that former employees may announce their new employment. (*American Credit Indemnity Co. v. Sacks* (1989) 213 Cal.App.3d 622, 634, 636; *Reeves*, *supra*, 33 Cal.4th at p. 1156.) But the court did not err in refusing to instruct on the italicized portion because it was potentially confusing (given that there was no trade secrets claim at issue and given that it referred to "clients," when the nurses on staffing registries are not technically clients) and because it was argumentative (given that it went beyond the legal principle to frame an argument favorable to defendants). (*People v. Moon* (2005) 37 Cal.4th 1, 30 (*Moon*) [court may decline an instruction if it "incorrectly states the law, is argumentative, duplicative [of other instructions], or potentially confusing"]; *Major v. Western*

31

*Home Ins. Co.* (2009) 169 Cal.App.4th 1197, 1217 [same].) Even if error, the court's instructional ruling was not prejudicial to the breach of duty and fraud-based claims upon which we affirm because, as explained above, they are based upon Labora and Greter's conduct *while they were Medipro employees*; as to these claims, the instruction regarding what *former* employees may do is irrelevant.

2. *Instruction regarding at-will employment*

Defendants asked the trial court to instruct the jury that "[a] defendant is not liable for intentional interference if the interference consists merely of extending a job offer that induces an employee to terminate his or her at-will employment." This instruction pertains to Medipro's claim against Sy and Certified for intentionally interfering with the employment contracts between Medipro and Labora and Greter; it has nothing to do with the breach of duty, the fraud-related, or the aiding and abetting a breach of duty claims upon which we affirm the verdict in this case. As a result, any error is by definition not prejudicial to our analysis. Declining to give the instruction was also not error because the jury was already instructed, with respect to the intentional interference count, that liability for intentional interference turns on proof that Sy and Certified's conduct "prevented [Labora's and Greter's] performance [of their contract with Medipro] or made performance more expensive or difficult," something a mere offer by Certified could not by itself establish. What is more, the instruction defendants requested was not supported by the evidence, which, as detailed above, showed that Sy and Certified did far more than "merely . . . extend a job offer." (*Moon*, *supra*, 37 Cal.4th at p. 30 [instruction not warranted "if it is not supported by substantial evidence"].)

32

*     *     *

For the first time in their reply brief, defendants argue that (1) the cumulative effect of the above stated errors warrants reversal, and (2) the trial court made "highly prejudicial" remarks while making rulings in front of the jury.  Both of these arguments are forfeited because they were not raised in defendants' opening brief, at a time when Medipro would have had an opportunity to respond to them.  (*People v. Tully* (2012) 54 Cal.4th 952, 1075 ["It is axiomatic that arguments made for the first time in a reply brief will not be entertained because of the unfairness to the other party"].)  These arguments lack merit in any event.  There is no cumulative error because, as explained above, there are no individual errors to cumulate.  And the transcript, which we have read from cover to cover, reflects no inappropriate commentary by the trial court.

## DISPOSITION

The judgment is affirmed.  Medipro is entitled to its costs on appeal.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
HOFFSTADT

We concur:


_____, P. J.
LUI


_____, J.
ASHMANN-GERST