Filed 4/1/25  Art Reproductive Center v. Hill CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| ART REPRODUCTIVE CENTER, INC., et al., | B332700 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. 18STCV08895) |
| v. | |
| DAVID HILL, Ph.D., et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Kevin C. Brazile, Judge.  Affirmed.

Ross and Peter W. Ross for Plaintiffs and Appellants.

Sauer & Wagner, Gerald L. Sauer and Gregory P. Barchie for Defendants and Respondents.

Plaintiffs and appellants ART Reproductive Center, Inc. (ART) and Advanced Reproductive Technologies of Santa Barbara, LLC (ART SB; together, the ART parties) appeal from the judgment entered after the trial court granted the motion in limine of defendants and respondents Dr. David Hill and Embryonics, Inc. (the Hill parties) to exclude the ART parties' expert opinion on damages. The ART parties also challenge the trial court's order summarily adjudicating ART's claims on the ground that ART lacked standing to sue for damages arising from an injury to ART SB.

Nonparty Dr. Alex Steinleitner was a manager of ART SB and his corporation, Alex Steinleitner, M.D., Inc. (Steinleitner Inc.; together with Steinleitner, the Steinleitner parties) was a member of ART SB. At the relevant times, Hill was a former owner of ART and former manager of ART SB. In 2017, Steinleitner, in violation of the non-compete clause of ART SB's operating agreement, established a medical laboratory in San Luis Obispo (the SLO laboratory), with Hill's involvement. The ART parties sued Steinleitner, then, in November 2018, they settled and released all claims against him (the settlement). The settlement permitted the Steinleitner parties to compete freely in San Luis Obispo County. It did not release any claims against Hill. The ART parties then instituted the instant action against the Hill parties for aiding and abetting breach of fiduciary duty and intentional interference with contractual relations. The claims were based on the Hill parties' involvement in helping the Steinleitner parties establish the SLO laboratory.

At an Evidence Code section 402 hearing,[1] the trial court excluded the testimony of the ART parties' damages expert. The expert's opinion was a calculation of lost profits ART SB suffered after the date of the settlement due to the loss of the Steinleitner parties' book of business. However, after the settlement, the Steinleitner parties could legally compete with ART SB and were free to divert their business to another lab. The trial court concluded the expert's failure to consider the practical effect of the settlement presented causation issues. As a result, the damages the expert identified were too speculative or unsupported to assist the trier of fact under *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 770 (*Sargon*). The ART parties conceded that they could not prove their claims without the expert's testimony.

We conclude the trial court properly excluded the lost profits opinions of the ART parties' expert. The ART parties have not argued the expert's opinion was unnecessary to establish ART's damages, or that any damages ART suffered were subject to a different analysis. We therefore need not address the ART parties' claim that the trial court erred in granting summary adjudication of ART's claims due to a lack of standing.

**FACTUAL AND PROCEDURAL BACKGROUND**

In or around February 2013, ART SB was formed as a manager-managed limited liability company. ART SB provided medical laboratory services associated with male and female reproductive systems and fertility and infertility issues. ART SB's "Class A Members" were ART, which owned 70 percent of ART SB, and Steinleitner Inc., which owned the remaining 30

---

[1] All undesignated statutory references are to the Evidence Code.

percent. Steinleitner and Hill, who at the time was an owner and employee of ART, were appointed as two of the three initial managers of ART SB. Hill is the sole director, officer, and shareholder of Embryonics, Inc.

Section 4.7 of the ART SB operating agreement provided in part: "[N]o Member nor any shareholder of a corporate Class A Member . . . shall, without the prior written consent of the Managers, either directly, indirectly, or through any Affiliate of such Member, provide services for or on behalf of, invest in, provide loans or other funds to, contract or affiliate with, or otherwise participate in the ownership, operation, management, or control of any Person that is or will be in competition with or that carries on or will carry on a business similar to, within San Luis Obispo County, Santa Barbara County or Ventura County, California . . . , the Company Business including the Reproductive Laboratory Enterprise . . . ."

Section 4.8 applied the same non-competition restrictions to former members for a three-year period after the transfer of their membership interest. The operating agreement provided that ART SB could seek injunctive relief and liquidated damages in the event of a breach of sections 4.7 or 4.8.[2]

Pursuant to a settlement agreement, in December 2016, Hill resigned from ART and was no longer an employee, manager, shareholder, and director of ART. Under the settlement agreement, Hill was not permitted to engage in any business competing against ART within 50 miles from ART's

---

[2] Section 12.19 of the operating agreement provided that the remedies set forth in the agreement "are cumulative and shall not exclude any other remedies to which [ART SB] or any other Person may be lawfully entitled."

4

offices in Beverly Hills or ART SB's offices and laboratory in Santa Barbara. San Luis Obispo County is more than 50 miles from Santa Barbara and Beverly Hills.

In January 2018, ART and ART SB filed a complaint against the Steinleitner parties, alleging the Steinleitner parties constructed and were operating the SLO laboratory, in competition with ART SB, in violation of section 4.7 of the operating agreement. The complaint asserted causes of action for breach of written contract (i.e., the operating agreement) and breach of fiduciary duty arising from the Steinleitner parties' status as members or managers of ART SB. In February 2018, ART SB removed Steinleitner as a manager. In April 2018, ART SB expelled Steinleitner Inc. as a member.

On or about November 15, 2018, the ART and Steinleitner parties settled their dispute pursuant to a handwritten settlement agreement. The Steinleitner parties agreed to pay the sum of $400,000, plus 5 percent yearly simple interest, to the ART parties over 30 months, beginning January 2019. The agreement provided for mutual complete general releases by each party of all other parties, of all claims. The releases applied to each party's agents, managers, employees, affiliates, and attorneys. However, the agreement stated: "Regardless of any other provision of this Agreement, nothing herein shall release David Hill from any claims." The parties also expressly waived the provisions of Civil Code section 1542.[3]

---

[3] Civil Code section 1542 provides: "A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her,

5

The settlement agreement also modified the Steinleitner parties' non-compete obligations. The parties agreed that the operating agreement's non-compete provision would no longer include San Luis Obispo County, and it would terminate on December 31, 2019. It is undisputed that, as of November 15, 2018, section 4.7 no longer applied to the Steinleitner parties, and they were free to compete against ART SB in San Luis Obispo County.

On December 18, 2018, the ART parties filed a complaint against the Hill parties, pleading causes of action for aiding and abetting breach of fiduciary duty and intentional interference with contractual relations. As relevant here, the complaint alleged that section 4.7 of the operating agreement prohibited any member of ART SB from operating a competing business in San Luis Obispo County, the Hill parties "were instrumental in helping the Steinleitner [p]arties set up and operate the competing medical laboratory" in San Luis Obispo County, and the Hill parties were aware of the fiduciary and contractual duties the Steinleitner parties owed to the ART parties.

The complaint further alleged that, as a result of the Hill parties' acts, "ART has suffered, and continues to suffer, the loss of its share of profits and distributions that otherwise would have been made . . . , diminishment of the value of ART's ownership interest, and the opportunity to utilize revenues, profits, and other amounts by which [t]he Steinleitner Parties were unjustly enriched that, by agreement, should have been shared with ART."

---

would have materially affected his or her settlement with the debtor or released party."

6

In response to multiple interrogatories the Hill parties propounded seeking specification of the ART parties' damages, the ART parties responded: "[ART SB's] revenues and profits have declined dramatically after the opening of the competing lab in San Luis Obispo. For example, from 2017 to 2018, [ART SB's] revenues and income declined $467,976, and $424,151, respectively. At that rate, [ART SB's] losses will be in the millions of dollars. Moreover, the value of [ART SB's] business is customarily calculated as a multiple of earnings. Plaintiff believes that the appropriate multiple is in the range of 8 to 12 times earnings. Therefore, Plaintiff conservatively estimates the decline in value in [ART SB's] business due to Defendants' conduct to be over $3,300,000."

In amended responses regarding ART SB's damages, the ART parties further responded: "The Steinleitner Parties breached the Operating Agreement and their fiduciary duties by opening the competing lab in San Luis Obispo. Defendants induced and assisted those breaches. The competing lab in San Luis Obispo has drawn patients and services that otherwise would have gone to ART SB's lab. ART SB's revenues have declined dramatically after the opening of the competing lab. For example, in 2016 and 2017—the two years before the SLO lab was opened—ART SB's revenues were $1,443,376 and $1,497,802, respectively. However, in 2018, ART SB's revenues fell to $1,009,798. And[ ] preliminary results show that ART SB's revenues for 2019 were $935,000."

Similarly, in describing ART's damages, the ART parties asserted: "ART has suffered, and continues to suffer, the loss of its share of profits and distributions that otherwise it would have received had Defendants not induced the Steinleitner Parties to

breach the Operating Agreement and had the Steinleitner Parties not breached the Operating Agreement, diminishment of the value of ART's membership interest, and the opportunity to utilize revenues, profits, and other amounts by which the Steinleitner Parties were unjustly enriched that should have been shared with ART."

In June 2021, the Hill parties moved for summary judgment, or in the alternative, summary adjudication. They argued that ART lacked standing to sue the Hill parties as its claims were derivative of claims belonging to ART SB. They further argued that the ART parties' causes of action lacked merit because they were made whole for any losses suffered by the alleged conduct of the Hill parties through the settlement. They asserted the ART parties' claim of future economic losses and diminution of value were too remote from the injury alleged in the complaint and were speculative and not recoverable as a matter of law.

The trial court granted summary adjudication as to ART's causes of actions brought individually, as ART was "asserting it lost its share of the profits of ART SB (e.g., via distributions) and experienced diminution of the value of its membership interest in ART SB," which was "directly based on 'injury to the corporation' of ART SB from competition by Steinleitner's [l]ab." The court therefore concluded the "gravamen of the claims for these damages . . . appears to be injury to ART SB and its stock." Thus, the claims were derivative in nature and belonged to ART SB rather than ART.

The court also rejected the contention that ART SB could recover damages from the Hill parties for the continued operation of the SLO laboratory after the settlement with the Steinleitner

8

parties. The court reasoned: "To the extent Defendants are liable for aiding and abetting or inducing Steinleitner's breach, Defendants could only possibly be liable for their conduct during the period Steinleitner could have breached his fiduciary and contractual duties. This was not possible after the Settlement. Logically speaking, Defendants could not have continued to aid and abet or induce a breach by Steinleitner, and so would not be liable. [¶] There is simply no support for ART's position that Defendants should have immediately closed the Lab following the Steinleitner settlement, which would have expressly permitted Steinleitner to continue operating the Lab even if he had not transferred it. ART's desire that the Lab close after the Settlement does not render the continued operation actionable as aiding and abetting Steinleitner's breach of duty or inducing his breach of the non-compete agreement. The fallout of that event was successfully settled for $400,000 and ART SB has shown no basis for further recovery based on post-November 2018 operations by Defendants. ART SB therefore does not appear entitled to recovery for those operations."

The court nonetheless denied the Hill parties' motion because "there [was] a triable issue of fact as to whether ART SB's continuing losses of profits after the Settlement are attributable to the breaches before the Settlement. . . . A reasonable trier of fact could conclude greater profits would have been earned after the settlement if not for Defendants' pre-settlement conduct. For example, if doctors that formerly referred patients to ART SB switched to the [SLO laboratory] before the Settlement and continued to refer patients to the [SLO laboratory]—and this pre-settlement conduct could be found to be a cause of continuing post-settlement damages."

9

The court also found there was a triable issue of fact based on the competing expert opinions as to whether the Steinleitner settlement of $400,000 would offset all damages attributable to the Hill parties' pre-settlement conduct.  Finally, the court rejected the argument that ART SB's damages were necessarily limited to liquidated damages under the operating agreement in light of section 12.19, which provided that the remedies set forth in the agreement were not exclusive.

At his subsequent deposition, the ART parties' expert, Dr. Robert W. Wunderlich, testified that ART SB's lost profits would continue for at least a period of three years pursuant to section 4.8 of the operating agreement, notwithstanding the settlement with the Steinleitner parties.  Wunderlich opined that transfers of business from ART SB's laboratory to the SLO laboratory occurred prior to the settlement and would represent ongoing damages beyond the time of the settlement agreement.[4]  Although he had calculated lost profits for a three-year period, he set no end date on profits ART SB would lose.  He stated that an example of when lost profits would end would be if Steinleitner died.

Counsel asked, "But what if there were other doctors still bringing patients to [the ART SB laboratory]?"  Wunderlich responded: "[M]y analysis that goes forward is based on the change in the IVF fees relative to the historic levels for the ART laboratory, and I could see that that change is really due to the

---

[4]     Wunderlich explained his use of the term "transfers": "I believe doctors would send out to a particular lab the samples for the labs to analyze and to do their work with.  And instead of the samples being sent to the ART lab, they were sent to a different lab."

10

transfer of Dr. Steinleitner's business." Counsel asked if Wunderlich had considered other factors, "such as other laboratories in Santa Barbara competing with ART SB[.]" Wunderlich responded: "Well, I have considered other factors, not specifically the one that you mentioned. But I looked to see whether or not the business associated with the other doctors had remained approximately constant during this time period. And so that the loss, I do associate with the loss of Dr. Steinleitner's business."

Wunderlich also testified concerning a lost value calculation, or the decrease in the business's sale price. He testified that he understood the business had been sold at some point for 8.2 times earnings before interest, tax, depreciation, and amortization (EBITDA). The ART parties' counsel had provided him with the 8.2 figure. Wunderlich did not recall whether he reviewed the sales documents to confirm that figure. He testified that, "if somebody wanted to establish lost value as opposed to lost profits, one could use that 8.2 multiplier, [and] multiply it by lost EBITDA." He had not performed that calculation. He also had not considered the time period on which to base the lost EBITDA calculation.

In June 2023, the Hill parties requested a section 402 hearing to determine whether, consistent with the trial court's ruling on the summary adjudication motion, ART SB's claimed damages post-dating the settlement and removal of the Steinleitner parties from ART SB could in fact be traced to the Hill parties' pre-settlement conduct.

The Hill parties argued that, although the complaint did not allege that the Steinleitner parties breached, or that the Hill parties induced a breach, of section 4.8 of the operating

11

agreement, Wunderlich had opined that ART SB lost profits for a period of three years, relying on section 4.8. The Hill parties further argued that Steinleitner ceased to owe any fiduciary duty to ART SB after his removal in February 2018 and Steinleitner Inc.'s contractual duty not to compete against ART SB ended upon its expulsion as a member in April 2018. They argued a section 402 hearing should be scheduled to determine whether claimed damages occurring after these dates could reasonably be attributed to the Hill defendants. The Hill parties additionally asserted that Wunderlich's lost value formula was speculative in light of testimony that the sale of ART SB was based on a negotiated number, not a multiple of its profits.[5]

At the section 402 hearing, the trial court reviewed the settlement and expressed its skepticism about the ART parties' theory that, despite the settlement freeing the Steinleitner parties to compete with ART SB in San Luis Obispo County, the Hill parties were nonetheless liable for damages arising from that competition until Steinleitner's death. The court noted the speculative nature of the proposed damages, suggesting this might be a problem under *Sargon*. The court nonetheless permitted Wunderlich to testify.

Wunderlich testified that "but for the alleged wrongdoing, Steinleitner's book of business would have stayed at ART SB, and it did not; and so, [ART SB] was damaged." The court inquired

---

[5] ART SB's investment banker testified: "[I]t's difficult to say exactly what the final number was ultimately based on other than a number of negotiations and just a back and forth. But, in the initial versions at least, EBITDA was the underlying factor on multiple spaces behind the consideration." ART SB's CEO testified that the ultimate purchase price was a negotiated number.

whether the settlement impacted the damages to which ART SB was entitled. Wunderlich stated that he could not "answer the legal questions [¶] . . . [¶] but from an economic perspective, but for the breach, that money, that book of business, still would have been at ART SB." He further testified: "I don't think it's speculative that, in this instance, if there had not been a [b]reach of the noncompete, Dr. Steinleitner would have been forced to, in essence, sit on the sidelines for three years." The court again expressed skepticism that ART SB was damaged in this way following the settlement and payment from Steinleitner.

Wunderlich testified that full performance of the contract would have meant that Steinleitner's book of business would have remained at ART SB until early 2021, as he would have had to wait three years to start his own business under the terms of the operating agreement. He further opined that Steinleitner would have had an economic incentive to keep his business indefinitely with ART SB if not for the breach, as he otherwise would have had to forgo ownership of a laboratory for three years.

Wunderlich calculated the lost net income to ART SB by estimating the revenues for ART SB if Steinleitner's book of business remained, offsetting that by the actual revenue of ART SB, and subtracting the expenses necessary to earn that revenue. This amount totaled approximately $1.2 million through 2021, in which case Steinleitner would have fully honored the non-compete provision of the operating agreement. However, because Wunderlich believed that Steinleitner would have had an economic incentive to remain for additional years, he also calculated damages through the end of 2022, which were approximately $1.5 million. Although he provided an end date,

13

he testified that "in the but-for world, the book of business would have stayed with ART SB" and that lost profits would continue "as long as the book of business is away."

With respect to the lost value opinion, Wunderlich testified that he did not recall who provided him with the 8.2 figure on which his opinion relied and that he did not recall reviewing any sales documents.

Wunderlich testified that the ART parties' loss as of the date of the Steinleitner settlement was less than the amount the ART parties received under the settlement.

The trial court granted the Hill parties' motion to exclude Wunderlich's testimony. The court indicated Wunderlich's opinions based ART SB's damages on Steinleitner "taking his business away, which, as a result of the settlement agreement, he had every right to do." The court noted that "under [Wunderlich's] analysis, if this Dr. Steinleitner lives for 50 years, [the ART parties] can keep recovering if he is practicing." The court further reasoned that the damages Wunderlich described were unavailable due to a lack of causation and were eliminated by the settlement.

Although the ART parties argued the trial court's ruling functioned as a nonsuit, the trial court disagreed. The parties ultimately entered into a stipulated judgment for the purpose of facilitating an appeal. The ART parties timely appealed.

## DISCUSSION

### I. The Trial Court Did Not Err in Excluding Wunderlich's Lost Profits Opinions

The trial court excluded Wunderlich's opinions on the grounds that they were speculative under *Sargon* and presented

14

issues of causation.[6]  The parties dispute the applicable standard of review and the correctness of the court's opinion.  We apply a de novo review standard of review and find no error.

## A.    Standard of Review

"The court may hear and determine the question of the admissibility of evidence out of the presence or hearing of the jury . . . ."  (§ 402, subd. (b).)  The ART parties contend the trial court's ruling was tantamount to a nonsuit because they lacked all evidence to support their damages claims without Wunderlich's testimony.  They therefore contend that this court must review the court's evidentiary ruling de novo.  The Hill parties argue that the trial court did not preclude testimony on pre-settlement damages or other evidence of post-settlement damages and the abuse of discretion standard is appropriate.

"California courts regularly conclude that 'if the trial court's ruling on a motion in limine precludes an entire cause of action, the ruling is subject to independent review on appeal as though the court had granted a motion for nonsuit.'  [Citations.]" (*Garner v. BNSF Railway Co.* (2024) 98 Cal.App.5th 660, 673.) However, "[i]n instances in which an in limine ruling does not preclude an entire claim but instead limits the evidence that will be offered to prove a claim, we review the ruling for an abuse of discretion.  [Citation.]  '[I]f the trial court's in limine ruling was based upon a misinterpretation of applicable law, an abuse of discretion has been shown.'  [Citation.]"  (*Dillingham-Ray Wilson v. City of Los Angeles* (2010) 182 Cal.App.4th 1396, 1403.)

---

[6]    The ART parties do not address Wunderlich's lost value opinion in any depth in their briefs.  Thus, they have forfeited any claim of error with respect to the exclusion of those opinions.

15

The trial court excluded Wunderlich's opinions at least in part based on *Sargon*. As the *Sargon* court explained, "[e]xcept to the extent the trial court bases its ruling on a conclusion of law (which we review de novo), we review its ruling excluding or admitting expert testimony for abuse of discretion. [Citations.] A ruling that constitutes an abuse of discretion has been described as one that is 'so irrational or arbitrary that no reasonable person could agree with it.' [Citation.] But the court's discretion is not unlimited, especially when, as here, its exercise implicates a party's ability to present its case. Rather, it must be exercised within the confines of the applicable legal principles." (*Sargon*, *supra*, 55 Cal.4th at p. 773.)

Here, the trial court's ruling excluded the ART parties' sole damages expert, thus preventing them from establishing an element of their causes of action. Further, the court's ruling was based in part on a conclusion that the ART parties could not establish causation relevant to the expert's opinion as a matter of law. This appeared to be the main context for the trial court's determination that the expert's opinion was speculative. We therefore review the trial court ruling de novo. (Cf. *Hearn Pacific Corp. v. Second Generation Roofing, Inc.* (2016) 247 Cal.App.4th 117, 130, fn. 6 [reviewing evidentiary ruling de novo because it was based on conclusion of law; noting that because a court abuses its discretion by transgressing the confines of applicable principles of law, the distinction between standards of review was immaterial].)

**B.    Admissibility of expert opinions**

" 'An expert opinion has no value if its basis is unsound. [Citations.] Matter that provides a reasonable basis for one opinion does not necessarily provide a reasonable basis for

16

another opinion.  Evidence Code section 801, subdivision (b), states that a court must determine whether the matter that the expert relies on is of a type that an expert reasonably can rely on "in forming an opinion *upon the subject to which his testimony relates*."  (Italics added.)  We construe this to mean that the matter relied on must provide a reasonable basis for the particular opinion offered, and that an expert opinion based on speculation or conjecture is inadmissible.'  [Citation.]"  (*Sargon*, *supra*, 55 Cal.4th at p. 770.)  " '[T]he expert's opinion may not be based "on assumptions of fact without evidentiary support [citation], or on speculative or conjectural factors . . . .  [¶] Exclusion of expert opinions that rest on guess, surmise or conjecture [citation] is an inherent corollary to the foundational predicate for admission of the expert testimony: will the testimony assist the trier of fact to evaluate the issues it must decide?" [Citation.]'  [Citations.]"  (*Ibid.*)

"Evidence Code section 802 . . . permits the trial court to find the expert is precluded 'by law' from using the reasons or matter as a basis for the opinion. ' "Law" includes constitutional, statutory, and decisional law.'  (Evid. Code, § 160.)  Thus, 'construed in the context of section 160, section 802 authorizes a court to promulgate case law restrictions on an expert's "reasons". . . .'  [Citation.]  This means that a court may inquire into, not only the type of material on which an expert relies, but also whether that material actually supports the expert's reasoning.  'A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.' [Citation.]"  (*Sargon*, *supra*, 55 Cal.4th at p. 771.)

"Thus, under Evidence Code sections 801, subdivision (b), and 802, the trial court acts as a gatekeeper to exclude expert

17

opinion testimony that is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, or (3) speculative. Other provisions of law, including decisional law, may also provide reasons for excluding expert opinion testimony." (*Sargon*, *supra*, 55 Cal.4th at pp. 771–772, fn. omitted.)

"But courts must also be cautious in excluding expert testimony. The trial court's gatekeeping role does not involve choosing between competing expert opinions. The high court warned that the gatekeeper's focus 'must be solely on principles and methodology, not on the conclusions that they generate.' [Citation.]" (*Sargon*, *supra*, 55 Cal.4th at p. 772.) " 'The discretion of a trial judge is not a whimsical, uncontrolled power, but a legal discretion, which is subject to the limitations of legal principles governing the subject of its action, and to reversal on appeal where no reasonable basis for the action is shown.' [Citation.]" (*Id.* at p. 773.)

Here, whether "the actual profits could logically be estimated in the manner [Wunderlich] claimed" depends on whether the Steinleitner settlement eliminated the causal relationship between the Hill parties' alleged tortious conduct and ART SB's lost profits. (*Sargon*, *supra*, 55 Cal.4th at p. 779.) Under such circumstances, the exclusion of Wunderlich's opinion would have been appropriate under section 802, which "permits the trial court to find the expert is precluded 'by law' from using the reasons or matter as a basis for the opinion." (*Id.* at p. 771.)

### C. Wunderlich's lost profits opinion was properly excluded

Causation is a necessary element of both claims against the Hill parties. (*Reeves v. Hanlon* (2004) 33 Cal.4th 1140, 1148

18

(*Reeves*) [intentional interference with contractual relations]; *Nasrawi v. Buck Consultants LLC* (2014) 231 Cal.App.4th 328, 343 (*Nasrawi* ) [aiding and abetting breach of fiduciary duty].) " 'A cause of injury, damage, loss or harm is something that is a substantial factor in bringing about an injury, damage, loss or harm.' [Citations.]" (*Franklin v. Dynamic Details, Inc.* (2004) 116 Cal.App.4th 375, 391.)

The ART parties contend that the settlement with the Steinleitner parties is irrelevant and does not affect their claims against the Hill parties. We disagree. As an initial matter, where a plaintiff releases a tortfeasor, that release does not discharge joint tortfeasors from liability, but "shall reduce the claims against the others in the amount stipulated by the release, the dismissal or the covenant, or in the amount of the consideration paid for it, whichever is the greater." (Code Civ. Proc., § 877, subd. (a).) Although the ART parties' settlement and release with the Steinleitner parties did not release any claims against Hill, Wunderlich conceded that the present value of the $400,000 Steinleitner settlement completely offset any damages the ART parties could recover from the Hill parties for the Steinleitner parties' pre-settlement conduct. Thus, at the very least, the settlement eliminated any damages the Hill parties could have owed the ART parties for pre-settlement losses.

However, the settlement agreement is also relevant due to the nature of the claims asserted and the specific terms of the settlement agreement. The ART parties' complaint against the Hill parties challenged their alleged acts of assisting the Steinleitner parties in breaching the operating agreement by engaging in competitive business activities. It is undisputed that

19

as of November 2018, when the ART and Steinleitner parties settled, the Steinleitner parties were free to compete against ART SB in San Luis Obispo County.  Despite being joint tortfeasors with the Steinleitner parties, the Hill parties could not be liable for aiding and abetting a breach of fiduciary duty or interfering with contractual relations once the fiduciary duty and contractual relationship at issue ceased to exist.  (*Reeves*, *supra*, 33 Cal.4th at p. 1148 [to prevail on intentional interference with contractual relations claim, plaintiff must prove the existence of a valid contract between the plaintiff and a third party]; *Nasrawi*, *supra*, 231 Cal.App.4th at p. 343 [first element of claim for aiding and abetting breach of fiduciary duty is third party's breach of fiduciary duties owed to plaintiff].)

Indeed, the ART parties do not expressly argue that they are entitled to damages they incurred as a result of the Hill parties assisting the Steinleitner parties in competing against ART SB *after* the settlement terminated the operating agreement's non-compete as to San Luis Obispo County.  (See *Imperial Ice Co. v. Rossier* (1941) 18 Cal.2d 33, 36 [competitor may induce a third party to forsake another competitor if no contractual relationship exists between the latter two].)

Instead, the ART parties contend they continued to suffer economic harm from the breaches that occurred *prior* to the settlement.  Thus, they argue the Hill parties' misconduct is the assistance they rendered to the Steinleitner parties in establishing the SLO laboratory—e.g, "helping the Steinleitner [p]arties set up and operate the competing medical laboratory," "advis[ing] the Steinleitner [p]arties on the equipment necessary for setting up such a laboratory," and "assembl[ing] the laboratory for the Steinleitner [p]arties."  The ART parties argue

20

on appeal that the "damage was done" as of the date of the establishment of the SLO laboratory and their post-settlement lost profit damages flow from this pre-settlement misconduct. They thus appear to contend that it is the continued operation of the SLO laboratory, diverting away business that would otherwise go to ART SB, that entitles them to damages incurred after November 2018.[7]

We acknowledge that " '[t]ort damages are awarded to fully compensate the victim for all the injury suffered.  [Citation.] There is no fixed rule for the measure of tort damages under Civil Code section 3333.  The measure that most appropriately compensates the injured party for the loss sustained should be adopted.  [Citation.]' [Citation.]" (*Metz v. Soares* (2006) 142 Cal.App.4th 1250, 1255.)

---

[7]    Neither the appellants nor the respondents have cited legal authorities relevant to the main issues in dispute in this appeal. The ART parties primarily rely on cases involving Civil Code section 1431.2, which describes liability for non-economic damages for personal injury, property damage, or wrongful death and provides for several damages limited to a particular defendant's proportionate share of comparative fault. (See *Hoch v. Allied-Signal, Inc.* (1994) 24 Cal.App.4th 48, 67; *Engle v. Endlich* (1992) 9 Cal.App.4th 1152, 1163.)  These cases, which involved a wrongful death action for an automobile accident (*Hoch*, at pp. 53–54) and a slip and fall negligence claim (*Engle*, at p. 1156), respectively, bear no resemblance to the circumstances before us and are not instructive on the lost profits and causation issues presented in this case.  The Hill parties rely on cases describing generally the elements of the ART parties' causes of action, and benefit of the bargain damages in circumstances entirely dissimilar from this case.  (See, e.g., *Moore v. Teed* (2020) 48 Cal.App.5th 280; *Fragale v. Faulkner* (2003) 110 Cal.App.4th 229.)

However, if the ART parties' hypothetical post-settlement damages were nothing more than the result of the Steinleitner parties continuing to compete against ART SB, the claim against the Hill parties would necessarily fail. The Steinleitner parties were immediately allowed to compete against ART SB in San Luis Obispo County pursuant to the settlement agreement. As a matter of law, the Hill parties could not be held liable for damages flowing from competition that the ART parties expressly agreed could occur. "A person who consents to an act is not wronged by it." (Civ. Code, § 3515.)

This is the problem the trial court recognized when ruling on the ART parties' summary adjudication motion. The court concluded there was a triable issue only as to whether continuing losses of profits were traceable to breaches before the settlement agreement. The court gave the example: "if doctors that formerly referred patients to ART SB switched to the Lab before the Settlement and continue to refer patients to the Lab—and this pre-settlement conduct could be found to be a cause of continuing post-settlement damages." This was potentially an example of post-settlement damages resulting from Hill's acts of assisting Steinleitner's breach of the operating agreement, but not based on Steinleitner's post-settlement competitive acts.[8]

Yet, Wunderlich's methodology and opinions, as explained in his declaration, at his deposition, and at the section 402

---

[8] We again note that after November 2018, agreements reached with the ART parties allowed both the Hill and Steinleitner parties to freely compete against ART SB in San Luis Obispo County. We assume without deciding that the court's example described a theory of lost profit damages occurring after 2018 that may have nonetheless permitted the ART parties to recover against the Hill parties.

hearing, did not reflect this relatively narrow category of potentially permissible post-settlement damages. In his declaration submitted in opposition to the motion for summary judgment, Wunderlich described his calculation of lost profits. He started with "a baseline level of sales based on the average of ART SB's revenue from [in vitro fertilization] fees for 2016 and 2017. [¶] [He] assumed that, but for the alleged wrongful behavior, sales would have remained constant at that level, without growth, for the three-year duration of the non-compete, i.e., for 2018, 2019, and 2020." At his deposition, Wunderlich testified that the losses he calculated were due to the transfer of Steinleitner's business away from ART SB.

At the section 402 hearing, Wunderlich was even more specific. He testified that in his analysis of lost profits, he assumed that, absent the breach, the average number of *Steinleitner's* in vitro fertilization fees in 2016 and 2017 would have remained at ART SB. He described this as the "transfer of the book of business from ART SB to the defendant's lab." Wunderlich described the decrease in profits relative to 2016 and 2017, and opined it was explained by "predominantly the loss of Dr. Steinleitner's book of business." He further assumed that "full performance" would have been "if Dr. Steinleitner had not breached the noncompete and if his book of business would have stayed at ART SB . . . ."

Wunderlich's testimony at the section 402 hearing made clear that his calculation of lost profits was not based on, for example, a loss of referrals from other doctors who would now patronize SLO laboratory, instead of ART SB. Instead, it was a direct calculation of the loss of Steinleitner's "sales," or, in other words, the fees Steinleitner specifically generated from in vitro

23

fertilization services.  Wunderlich did not indicate, and the ART parties did not argue, that the nature of Steinleitner's "sales" were such that they would continue to generate profits or business for ART SB for years after the "sale" was made, irrespective of Steinleitner's involvement.  Rather, Wunderlich's damages analysis was based on an assumption that *Steinleitner* would have continued generating in vitro fertilization fees for ART SB, consistent with the number of "sales" he made in 2016 and 2017.  Despite the court's questions during the section 402 hearing, the ART parties did not elicit testimony from Wunderlich demonstrating that his analysis contemplated, or could be modified to reflect, only the loss of profits, if any, arising from the in vitro fertilization fees the Steinleitner parties diverted from ART SB before the settlement.

We therefore find no error in the trial court's conclusion that Wunderlich's opinions could not assist the trier of fact in evaluating ART SB's legally permissible damages.  Although Wunderlich testified that his opinions were based on the idea that Steinleitner's "book of business" would have stayed at ART SB absent the pre-2018 breach of the operating agreement's non-compete provision, there was no evidence that the "book of business" would have continued generating profits without Steinleitner's participation.  Indeed, that would have been contrary to the detail provided in Wunderlich's declaration, which indicated his calculations were based on Steinleitner making continued "sales" in 2019, 2020, and 2021.

Thus, while the trial court allowed for the possibility that the ART parties could show damages flowing from the Hill (and Steinleitner) parties' pre-settlement conduct that extended past the time of settlement, Wunderlich's opinion failed to be based on

any such damages.  Instead, his calculations assumed the ART parties could continue to recoup damages from Steinleitner's ongoing withholding of his own business from ART SB, past the settlement date.  Wunderlich's testimony made clear that his opinion was not based on the operation of the SLO laboratory as a competitive force in the San Luis Obispo County market in a general sense.  Because his opinions did not take into account that after the settlement, the ART parties *consented* to the Steinleitner parties' ongoing competition and Steinleitner's removal of his business from ART SB, they would not assist the trier of fact in evaluating the ART parties' damages incurred after the settlement.

As we understand the ART parties' argument, they contend that because the SLO laboratory came into existence, Steinleitner was able to "refer" his own patients there, and, even after the settlement, the continued existence of the SLO Lab permitted him to refer his patients there, instead of ART SB.  The ART parties frame this as an ongoing loss of business facilitated by the pre-2018 creation of the SLO Lab, rather than Steinleitner's competitive activity.

The ART parties fail to support their assertions regarding Steinleitner's post-settlement activity with any citation to the record.  We decline to find error in the trial court's ruling based on unsupported factual assertions made on appeal.  (*Falcon v. Long Beach Genetics, Inc.* (2014) 224 Cal.App.4th 1263, 1267.)  Moreover, we disagree that this alternative characterization of the ART parties' theory of the case renders Wunderlich's opinion more pertinent to a valid legal theory of damages.  Wunderlich's opinion was expressly based on Steinleitner's removal of his business from ART SB, or Steinleitner's failure to continue

25

producing "sales" for ART SB.  The settlement agreement was not irrelevant because it demonstrated the ART parties' consent to Steinleitner removing his business from ART SB and taking it elsewhere.  Having consented to this conduct, the ART parties cannot use it as a basis to obtain damages from Hill.  Since that was the only basis for Wunderlich's opinions and evaluation of lost profits, the trial court did not err in excluding his testimony.

Further, to the extent the ART parties intended to use Wunderlich's opinions to advance the argument that, taking into consideration Steinleitner's permissible diversion of his business from ART SB, ART SB still suffered the lost profits Wunderlich described, the trial court properly concluded the opinion was too speculative, and based on assumptions of fact without evidentiary support.  (*Sargon*, *supra*, 55 Cal.4th at p. 770.)

26

## DISPOSITION

The judgment is affirmed.  Respondents to recover their costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


ADAMS, J.


We concur:



EDMON, P. J.




EGERTON, J.